29 F.3d 1297
 39 ERC 1129, 25 Envtl. L. Rep. 20,153
 UNITED STATES of America, Appellant,
v.
Charles E. KNOTE; Ruth R. Knote; Elizabeth A. Knote, Cape
Chemical Company, Inc.; Cape-Kil Pest Control
Company, Inc.; and Kem-Pest
Laboratories, Inc., Appellee.
 No. 93-2526.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 13, 1994.
Decided July 20, 1994.
 
 Evelyn S. Ying, Washington, DC, argued (Tom C. Clark and David C. Chilton, on the brief), for appellant.
 John S. Hahn, Washington, DC, argued (Kirk R. Ruthenberg and Stuart E. Hunt, on the brief), for appellee.
 Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and STROM,* District Judge.
 BEAM, Circuit Judge.
 
 
 1
 The EPA appeals a district court[1] order requiring it to follow the dispute-resolution process set out in a consent decree governing certain relations between the Knotes,[2] their property, and the EPA. According to the EPA, the dispute at hand does not fall within the purview of the decree. We disagree and affirm the district court.
 
 I. BACKGROUND
 
 2
 This litigation arises out of the environmental cleanup of six acres and a building located in Missouri and owned by the Knotes. The EPA and the Knotes agreed to enter into a consent decree concerning the cleanup. At the time the draft decree was presented to the district court, the EPA officially planned to decontaminate the building. Approximately one year after the district court entered the consent decree, the EPA changed its plan and decided to demolish the building instead. The Knotes invoked the decree's internal dispute-resolution process, claiming that the EPA's change of plan was not supported by the data, and that the EPA had violated the decree by refusing to share the data that would show whether demolition was necessary or cost efficient. The EPA refused to follow the decree's dispute-resolution process,[3] arguing that the consent decree did not confine the EPA's choice of response actions. The Knotes requested that the district court order the EPA to abide by the dispute-resolution process set out in the decree. The district court did so, ordered the EPA to analyze and provide the Knotes with the requested data,[4] and enjoined the demolition of the building until the dispute-resolution process had been followed.
 
 II. DISCUSSION
 A. Jurisdiction
 
 3
 The Knotes first argue that we have no jurisdiction to hear this appeal because the district court's order is not "final," and because the EPA's voluntary compliance pending appeal renders the issue moot. We disagree. See, e.g., Walker v. United States Dep't of Housing and Urban Dev., 912 F.2d 819, 825 (5th Cir.1990) (order interpreting obligations under consent decree final; voluntary compliance pending appeal does not moot issue of whether order exceeded court's authority under consent decree); Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist., 763 F.2d 1032, 1034 n. 1 (9th Cir.) (same), cert. denied, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985); see also Miller v. Alamo, 975 F.2d 547, 549-50 (8th Cir.1992); Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1328-33 (1st Cir.1991); Brewster v. Dukakis, 675 F.2d 1, 3-4 (1st Cir.1982).
 
 B. Merits
 
 4
 The EPA argues that the district court's order results from a misinterpretation of the consent decree. According to the EPA, the consent decree is a simple cash-out agreement in which the Knotes agreed to pay $440,000 in exchange for the EPA's promise not to sue them for the costs of the cleanup. It contends that the decree does not cover response actions, and in fact expressly excludes such actions from its terms. Therefore, the dispute-resolution section of the decree cannot reasonably be thought to apply to disagreements arising from a response action.
 
 
 5
 According to the Knotes, and the district court,[5] the decree was entered into with the understanding that the building in question would be decontaminated rather than demolished. Under this analysis, the decree covers issues relevant to that response action, such as reasonable access to the site by the EPA, sharing of data by the EPA, and negligent or reckless damage to the building by the EPA. The Knotes also argue that they bargained to obtain timely or otherwise unavailable judicial review of arbitrary and capricious decisions by the EPA through the dispute-resolution process.
 
 
 6
 In reviewing a district court's interpretation of a consent decree, we basically look to rules of contract interpretation. United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); United States v. City of Ft. Smith, 760 F.2d 231, 233-34 (8th Cir.1985). Our review is de novo where the district court's interpretation of the decree is based solely on the written document, and clearly erroneous where the interpretation is based on extrinsic evidence. See Towers Hotel Corp. v. Rimmel, 871 F.2d 766, 770-71 (8th Cir.1989). However, even when interpreting the meaning of a consent decree "as written," we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order. ITT, 420 U.S. at 243, 95 S.Ct. at 938. This is because a consent decree is a "peculiar sort of legal instrument that cannot be read in a vacuum. It is a kind of private law, agreed to by the parties and given shape over time through interpretation by the court that entered it." Sennewald v. University of Minnesota, 847 F.2d 472, 475 (8th Cir.1988) (R. Arnold, J., concurring). We therefore give a large measure of deference to the interpretation of the district court that actually entered the decree. Id.
 
 
 7
 The district court found that the consent decree had been arrived at with the understanding that the Knotes would be left with a decontaminated and usable site and building. Hence, the provisions which give the EPA reasonable access, provide for data sharing as to the cleanup, put restrictions on marketability until the successful conclusion of the cleanup, and reserve any rights the Knotes might have to be compensated for the EPA's negligent or reckless damage to their property. The EPA argues that the district court clearly erred in determining the context of the decree because it misunderstood the sequence of events. As the EPA notes, the Knotes agreed to the language of the draft consent decree in August of 1990, and the issuance of the Record of Decision (ROD), the last administrative action necessary for the EPA to choose decontamination as its official response action, did not take place until December of 1990. Therefore, according to the EPA, the Knotes could not have relied on a planned end result of a decontaminated building in agreeing to the language of the decree.
 
 
 8
 However, the district court's express consideration and rejection of the EPA's timing argument belies the EPA's assertion that the district court misunderstood the sequence of events. United States v. Knote, 818 F.Supp. 1280, 1284 (E.D.Mo.1993). The district court's discussion shows that it had a complete understanding of the sequence of events and the importance the EPA attached to that sequence; it simply disagreed that the sequence was determinative of the controversy. The district court found that the feasibility study underlying the December 1990 ROD was completed before the Knotes agreed to the draft consent decree, and that they relied on that study in so doing. Id. The EPA has made no argument or showing that this finding was error.
 
 
 9
 Further, while the parties agreed to the draft decree in August of 1990, it was not even presented to the district court, or for notice and comment, until July of 1991, well after the official December 1990 ROD was issued. Just as the consent decree did not spontaneously spring up in final form to be entered by the district court in September of 1991, we find incredible any proposition that the content of the December 1990 ROD was a complete surprise to the Knotes.[6] The parties delay in presenting the draft decree to the district court until well after decontamination became the official plan is consistent with the court's finding that the negotiations were based on a consensus that the building would be decontaminated and not destroyed. The EPA's timing argument does not convince us that the same decree would have been presented to the court had demolition been the outcome of the 1990 ROD. In view of the district court's superior knowledge of the situation, the EPA's failure to support its contention of clear error with anything other than the date of the official ROD, and the parties conduct in delaying presentation of the draft decree to the court until well after the final ROD issued, we find no error in the district court's understanding of the context of the decree. Thus, it is in that context that we consider the decree as written.
 
 
 10
 The decree has twenty-one separate sections, each addressing a particular point. Two sections, III and XI, contain the language that the EPA claims exempts amendment of its decision to decontaminate the building from the ambit of the decree. Section III deals with access to the site, and Section XI deals with the EPA's reservation of causes of action arising out of the contamination.
 
 
 11
 Section XI provides that "except as provided in Section X, [nothing] shall in any way limit or restrict the response and enforcement authority of the United States to initiate appropriate actions under Sections 104, 106 and 107 of CERCLA ... against Defendants or against any other person or entity not a party to this Decree." EPA Appendix at 31 (emphasis added). Section X, which immediately precedes the above reservation, outlines the EPA's covenant not to bring a civil suit against the Knotes under certain sections of CERCLA or RCRA for releases of hazardous substances currently at or around the site. The reservation of rights in Section XI, although citing Section 104 (a source of response action authority) is internally limited to reserving appropriate actions against persons or legal entities. Neither the EPA's demolition nor decontamination of the building can fairly be said to be such an action. From both its location and language, one can, and the district court obviously did, fairly read this reservation of rights as being concerned solely with causes of action against persons and other legal entities, including the Knotes. It therefore does not perform the function the EPA would have us attribute to it.
 
 
 12
 The reservations of rights in Section III also fail to perform as the EPA claims. Part A of Section III outlines the EPA's access to the site. Part B reserves the EPA's "access, information gathering, inspection and enforcement authorities and rights under CERCLA, RCRA and other applicable statutes and regulations." Part C declares that "[n]othing in this Consent Decree shall in any manner restrict or limit the nature or scope of response actions which may be taken by [the] EPA in exercising its authority under federal law." EPA Appendix at 21 (emphasis added). Because the EPA chose to deal with the reservation of its response action authority separately from those authorities reserved in Part B (which does not mention response authority), and because CERCLA has a separate "Response Authority" section, 42 U.S.C. Sec. 9604, we believe Part C is the only reservation of rights relevant to this dispute.
 
 
 13
 The question then becomes whether Part C of Section III is incompatible with the district court's order that the EPA engage in the decree's dispute-resolution process before proceeding to demolish the building. The dispute-resolution process is simple. The parties are to engage in informal discussions for up to fourteen days. If they fail to find common ground, a written presentation of the facts and problem is to be given to the other party within ten days thereafter. The EPA then decides the dispute, based on that written presentation and other relevant portions of the administrative record. Such decision is final unless it is appealed to the district court within ten days. The district court may reverse the disputed decision only if the Knotes prove it is arbitrary and capricious.
 
 
 14
 The decree's only possible restriction or limitation on "the nature and scope of response actions" would be to prevent arbitrary and capricious actions. This is indeed a restriction and limitation, so seemingly Part C of Section III does exempt response actions from the decree. However, on closer examination, it is apparent that Part C operates only to forbid the restriction or limitation of the nature and scope of those response actions which the EPA may perform "in exercising its authority under federal law." Federal law, of course, does not authorize the EPA to engage in arbitrary and capricious response actions. Therefore, the decree's limitation of arbitrary and capricious action does not impinge on the reservation of rights as to response actions in Section III, Part C.
 
 
 15
 The determination that Part C, as written, does not unambiguously exempt this dispute from the decree or the dispute-resolution process in Section XIII does not end our inquiry. We must still examine the district court's decision that the decree encompasses this disagreement. As the EPA points out, none of the twenty-one individual sections of the decree explicitly cover the decontamination plan. However, the parts of the decree cannot be viewed in isolation. The structure and context of the decree must also be considered, see supra at 1299; ITT, 420 U.S. at 238-43, 95 S.Ct. at 935-38. Because the district court found that the decree was entered in the context of an understanding that the building would be decontaminated, it is in that context that we view the language and structure of the document.
 
 
 16
 Section III of the decree addresses the EPA's access to the site. Part A provides reasonable access to the site for, among other things, the purpose of performing the remedial action and for "assessing the need for, planning or implementing additional response actions at or near the site...." EPA Appendix at 21. As mentioned, Part C of the same section reserves the EPA's right to engage in response actions whose nature and scope are not arbitrary and capricious. Part E reserves whatever rights the Knotes' may have to sue the EPA for negligent or reckless damage to the formulation building. Section XVI requires the EPA to share data from the site with the Knotes. Section XVII provides for the continuing jurisdiction of the court to enforce the decree. Section XIII governs dispute resolution. Part A of that section sets out a process for informally resolving "any disagreements concerning implementation of this Decree." Part B outlines the more formal method for dealing with "any dispute arising under this Decree [that] is not resolved informally...." Part D provides for court review of disputed EPA decisions for arbitrariness and capriciousness. Viewing these sections together, we cannot say that the Knotes' dispute with the EPA's postdecree decision to demolish rather than decontaminate the building is clearly outside the ambit of the decree.
 
 
 17
 The data-sharing provisions, marketing restrictions, and reservation of claims for negligent or reckless damage to the building all combine to give a reasonable inference that the decree contemplates a decontaminated and usable building. To read the fate of the building out of the decree would render parts of the decree internally inconsistent or meaningless. Further, the decree grants reasonable access to plan further response actions if such are needed. Section III, Part A. That provision alone is enough to make the dispute about the postdecree decision to demolish the building one which "concern[s] implementation of th[e] Decree" or "aris[es] under th[e] Decree," and thus a proper subject for Section XIII dispute resolution. Therefore, the district court's interpretation of the consent decree was not error.
 
 
 18
 Finally, even if the structure, language, and context of the decree did not combine to render the district court's interpretation of the text permissible, the district court "has [the] inherent equitable power to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.' " Ft. Smith, 760 F.2d at 233 (quoting United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932)); accord Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141, 1148-49 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); see E.E.O.C. v. Local 580, 925 F.2d 588, 592-93 (2d Cir.1991). The district court was clearly satisfied that the circumstances underlying the decree had changed. It was also satisfied that the Knotes had relied on an EPA plan to decontaminate the building in entering into the decree and that to exempt the decision to change that plan from the decree's simple dispute-resolution process would turn the decree into an instrument of wrong, "decei[t]," and "bully[ing]." 818 F.Supp. at 1284. We would be loath, under these circumstances, to find that the court abused its inherent power to insure that a decree issued under its auspices did not become an instrument of wrong.
 
 III. CONCLUSION
 
 19
 For the reasons stated above, we affirm the district court's order.
 
 
 
 *
 The HONORABLE LYLE E. STROM, Chief United States District Judge for the District of Nebraska, sitting by designation
 
 
 [1]
 The Honorable Stephen L. Limbaugh, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 For convenience we shall refer to the appellees, Charles, Ruth, and Elizabeth Knote, Cape Chemical Company, Inc., Cape-Kil Pest Control Company, Inc., and Kem-Pest Laboratories, Inc., collectively as "the Knotes."
 
 
 [3]
 This is a simple process, which calls for informal talks about the problem, to be followed, if necessary, by a written submission to the EPA which then makes a final decision. That decision may be reviewed by the district court only for arbitrariness and capriciousness, with the Knotes bearing the burden of proof. EPA Appendix, at 31-32
 
 
 [4]
 During the district court proceeding, the EPA admitted it had never analyzed the relevant data from the building
 
 
 [5]
 The court below is the same court that issued the consent decree
 
 
 [6]
 The district court, which was on the scene, found the same proposition "ludicrous." 818 F.Supp. at 1284