# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2001

_____

| | | |
|---|---|---|
| Reggie White; Michael Buck, Hardy Hardy Nickerson; Vann McElroy; Dave Duerson, | * * * * | |
| Appellees, | * * | |
| v. | * * | |
| National Football League; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty-Niners, Ltd.; The Seattle Seahawks Inc.; Tampa Bay Area NFL Football Club, | * * * * * * * * * * * * * * * * * * * * * * * * * * * | Appeal from the United States District Court for the District of Minnesota. |

Inc.; Pro-Football, Inc.,                          *
                                                    *
                    Appellants.                     *
                                          _____

                     Submitted:  March 12, 2009
                         Filed:  November 10, 2009
                                          _____

Before WOLLMAN, RILEY, and COLLOTON, Circuit Judges.
                                          _____

WOLLMAN, Circuit Judge.

        Since the entry of a 1993 consent decree, the district court[1] has overseen the enforcement of a settlement in an antitrust class action brought by the above-named class members against the National Football League and its member clubs (NFL or League). Throughout that time, the district court has resolved numerous disputes over the terms of the Stipulation and Settlement Agreement (settlement agreement) and parallel Collective Bargaining Agreement (CBA) that govern player employment in the NFL.

        In August 2007, Michael Vick, then quarterback for the Atlanta Falcons, pled guilty to federal dog fighting charges. The NFL Commissioner thereafter suspended Vick indefinitely without pay, and the League initiated a grievance procedure seeking a declaration that the Falcons could recover certain bonus money that had been paid to Vick with the expectation that he would play football through 2014. Class counsel and the National Football League Players Association (Association) challenged the recovery as violative of anti-forfeiture provisions contained in the settlement agreement and CBA. Special Master Stephen Burbank issued an opinion that the

_____

        [1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

-2-

Falcons were entitled to recover the amounts sought. The decision was appealed to the district court, which entered an order (Vick Order) stating that the bonus payments were already earned and thus not subject to forfeiture. The League then filed a Rule 60(b) motion to vacate the district court's judgment, arguing that (1) the district court's oversight of the consent decree should be terminated because of intervening changes in the law and factual circumstances and (2) the district judge should remove himself from the case because of the reasonable perception that he was biased. The district court denied the motion. The League now appeals from the Vick Order and the denial of its Rule 60(b) motion to vacate the judgment. We affirm.

## I. Factual Background

### A. The White Settlement Agreement

The 1993 settlement represented the resolution to a decades-old dispute between football players and team owners. Although professional football generates significant revenue, players and owners often have differing ideas about how the money should be spent. Owners desire cost-cutting mechanisms such as salary caps and player drafts; players want free agency and competition among clubs for the best talent. For many years, team owners worked together to minimize labor costs, instituting, for example, the Rozelle Rule—a measure that virtually eliminated free agency by requiring any team acquiring a free agent to compensate the player's original team. This court's decision in Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), ended that practice, holding that the Rozelle Rule violated antitrust law as an impermissible restraint on competition for player services. The fact that the Rozelle Rule was unilaterally implemented by team owners was critical to our holding, because we recognized that a similar collectively bargained provision would have been shielded from antitrust liability by the nonstatutory labor exemption to the antitrust laws. See id. at 615-16.

The players' initial antitrust victory was short lived, for following the ruling in Mackey the owners used their leverage in collective bargaining to reestablish the status quo, exchanging the Rozelle Rule for similar collectively bargained provisions that were impervious to antitrust attack. See Powell v. National Football League, 930 F.2d 1293, 1304 (8th Cir. 1989) (holding that the collectively bargained "Right of First Refusal/Compensation" system was not subject to antitrust liability). The Association organized strikes in 1982 and 1987, but those efforts failed to win free agency or other desired changes in League rules. Consequently, in 1989 the Association chose to decertify as a union and abandon collective bargaining in favor of renewed antitrust litigation.

After several successful antitrust lawsuits brought by individual players, Reggie White and four other named plaintiffs filed a lawsuit in the United States District Court for the District of Minnesota on behalf of

> (i) all players who have been, are now, or will be under contract to play professional football for an NFL club at any time from August 31, 1987, to the date of final judgment . . . and (ii) all college and other football players who, as of August 31, 1987, to the date of final judgment . . . have been, are now, or will be eligible to play football as a rookie for an NFL team.

The complaint sought antitrust injunctive relief and damages stemming from various League rules, including the mandatory right of first refusal system, the standard NFL contract, and the college draft. On April 30, 1993, the district court approved a consent decree that provided the players with monetary relief and made a variety of significant changes to League rules. The agreement also allowed for the recertification of the Association and the resumption of the collective bargaining relationship between the players and the owners. Additionally, the settlement stated that the district court would retain jurisdiction over the enforcement of the agreement

through appointment of a Special Master, who would hear disputes subject to review by the district court.

Since the original approval of the settlement agreement, it has been amended five times, most recently in 2006. Each time, the enforcement jurisdiction of the district court has been retained as part of the agreement. A new CBA was also formed in 1993, with terms mirroring those in the settlement agreement. Thereafter, whenever the parties have agreed to change a provision in the CBA, a conforming change has also been made to the settlement agreement. In the event of a conflict, the provisions in the settlement agreement trump the CBA.

## B. Michael Vick's Contract

One of the changes to the settlement agreement in 2006 was the addition of an anti-forfeiture provision, the effect of which was to limit the instances in which players would have to return money to their teams. Guaranteed income is coveted by football players, due to the high risk of injury and the fact that the standard NFL contract allows a team to cut a player who does not meet expectations. As a result, players commonly negotiate bonus payments in addition to their yearly salary. The bonuses may be guaranteed for skill or injury—thus allowing a player to keep the money in certain instances in which the remainder of his contract (i.e., yearly salary) is terminated.[2] Although some of the terms of individual player contracts may vary, a contract cannot provide for forfeiture that is prohibited under the terms of the settlement agreement and CBA.

In 2004, Vick negotiated a contract with the Atlanta Falcons to play football for the team through 2014. In addition to a yearly salary, the contract included two roster

---

[2]A skill guarantee ensures that a player can retain the bonus regardless of his subsequent performance level; an injury guarantee ensures that a player can retain the bonus even if he is subsequently injured and unable to play.

bonuses—one for 2005 ($22.5 million) and one for 2006 ($7 million).[3] The contract stated that the bonus amounts would be additional consideration for the execution of the long-term player contract, provided that (1) Vick adhered to all contract provisions and (2) Vick was on the Falcons' eighty-man roster on the fifth day of the 2005 and 2006 league years. The contract also gave the Falcons the discretion to guarantee the bonuses for skill and stated that, if so guaranteed, Vick had an obligation to execute a new contract setting forth the terms of the skill guarantee. The Falcons subsequently exercised their right to guarantee the bonuses for skill. Vick met the roster provisions in the contract and was accordingly paid $29.5 million.

As set forth above, after playing just two seasons under his contract, Vick pled guilty to federal dog fighting charges and was suspended by the League Commissioner. The Falcons sought to recover $16.22 million from Vick, a prorated portion of the bonuses based on the remaining years in his contract that he was unable to perform. On behalf of the Falcons, the League filed a grievance with the Special Master seeking a declaration that recovering the bonus money would not violate the anti-forfeiture provisions in the CBA and settlement agreement. The Special Master determined that the Falcons could recover bonus payments properly allocable to years Vick had not performed. On appeal, the district court disagreed, concluding instead that Vick's failure to perform was irrelevant because Vick had fully earned the bonus payments when he met the roster provisions in his contract.

---

[3]A roster bonus is additional compensation contingent on a player appearing on his team's roster as of a specified date. Generally speaking, the existence of the condition precedent distinguishes a roster bonus from a signing bonus, which is paid upon the signing of a contract.

## C. The League's Rule 60(b) Motion

Following the district court's ruling on the forfeiture issue, the League filed a Rule 60(b) motion to vacate the judgment on the ground that (1) the Supreme Court's decision in <u>Brown v. Pro Football, Inc.</u>, 518 U.S. 231 (1996), as well as changes in factual circumstances, warranted a modification of the consent decree to eliminate the district court's oversight; and (2) the district judge's statements in two sports-related news articles and his practice of having *ex parte* meetings with counsel for the Association created a perception that he was biased against the League.

On the issue of bias, the district judge stated that his comments in the sports articles did not relate to the merits of the Vick proceeding and would not lead a reasonable person to question his impartiality. The district judge acknowledged having had *ex parte* meetings with counsel for the Association, but stated that a reasonably informed person would know that the merits of a proceeding were never discussed, that such meetings often preceded decisions in the League's favor, and that the practice is the result of a long history—stemming back to the 1993 settlement—in which both parties were invited to meet in the judge's chambers for coffee and the exchange of social pleasantries. Concluding that the League had not established a reasonable perception of bias, nor any changed circumstances warranting modification of the consent decree, the district court denied the Rule 60(b) motion.

## II. Discussion

Because the League's Rule 60(b) motion implicates the broader issues of the district court's continuing supervision of the settlement agreement and the propriety of the district judge's participation in the case, we address those arguments before turning to the narrower forfeiture issue.

## A. Modification of the Consent Decree

We review for abuse of discretion a district court's denial of a Rule 60(b) motion to amend the judgment. Keith v. Mullins, 162 F.3d 539, 541 (8th Cir. 1998). Federal Rule of Civil Procedure 60(b)(5) provides that "[o]n motion and just terms, the court may relieve a party . . . from a final judgment . . . [if] applying it prospectively is no longer equitable." A district court thus retains authority to modify an injunction entered pursuant to a consent decree "when changed circumstances have caused it to be unjust." Keith, 162 F.3d at 540-41. A consent decree must also be modified if "one or more of the obligations placed upon the parties has become impermissible under federal law." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 388 (1992); see also Gavin v. Branstad, 122 F.3d 1081, 1088 (8th Cir. 1997) (observing that "a court that takes Rufo seriously" must consider altering a consent decree if changed circumstances have made compliance substantially more onerous, changed laws have made legal what the decree was designed to prevent, or if the agreement was based on a misunderstanding of governing law). "Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." Rufo, 502 U.S. at 385.[4]

---

[4]The parties dispute whether the standard announced in Rufo is limited to institutional reform cases or whether it applies to Rule 60(b)(5) motions in other contexts. Compare W.L. Gore & Assocs. v. C.R. Bard, Inc., 977 F.2d 558, 562-63 (Fed. Cir. 1992) (differentiating institutional reform cases from consent decrees settling commercial disputes), with In re Hendrix, 986 F.2d 195, 198 (7th Cir. 1993) (observing that Rufo's flexible standard is not limited to institutional reform cases), and Alexis Lichine & Cie. v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582, 586 (1st Cir. 1995) (adopting an intermediate position wherein the court considers the identity of the parties in its Rule 60(b)(5) analysis). Although it is unnecessary to resolve this question in the present appeal, we note that the Supreme Court's recent decision in Horne v. Flores, 129 S. Ct. 2579, 2593 (2009), highlights several concerns in institutional reform cases that may not be present in other contexts.

The League argues that, post-Brown, the district court's oversight of the settlement agreement is no longer permissible because it amounts to unlawful meddling in the collective bargaining process. We disagree. The issue in Brown was whether the players could bring an antitrust lawsuit against NFL owners after labor negotiations had reached an impasse and the owners unilaterally implemented the terms of their last best offer. 518 U.S. at 234. The Court held that the owners could not be sued because the nonstatutory labor exemption to the antitrust laws protected their conduct. Id. at 250. Brown addressed antitrust liability, whereas the question presented here is whether a district court may maintain oversight pursuant to the terms of an antitrust settlement.

The rationale in Brown does not apply in the present context. In Brown, the Court gave two primary reasons for shielding owners from antitrust liability: (1) a concern that such liability would stifle behavior integral to the bargaining process, and (2) a desire to defer to the congressionally sanctioned balance of power between labor unions, owners, and the National Labor Relations Board. See id. at 236-37, 241-42. With regard to the first reason, the Court recognized that the nonstatutory labor exemption was necessary to avoid placing the owners in an untenable position, observing that permitting antitrust liability in such situations would "introduce instability and uncertainty into the collective-bargaining process, for antitrust law often forbids or discourages the kinds of joint discussions and behavior that the collective-bargaining process invites or requires." Id. at 242. In this case, however, there is no concern that the collective behavior necessary for effective bargaining will become fodder for an antitrust lawsuit. For the last sixteen years, the League has had an active collective bargaining relationship with the Association, and there is no indication that the owners have been restrained by any fear of antitrust liability. The second reason is similarly inapplicable because the parties' agreement to the district court's involvement mitigates concerns about unsettling the power structure under the labor laws.

Moreover, the law in this circuit at the time the parties entered the settlement agreement was fully consistent with Brown. In 1989, we considered the scope of the nonstatutory labor exemption and reached a nearly identical conclusion. See Powell, 930 F.2d at 1304. The basic dichotomy between labor law and antitrust, as well as its application in professional sports, was recognized decades ago. See, e.g., Michael S. Jacobs & Ralph K. Winter, Jr., Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L.J. 1 (1971). When the settlement was approved, both the League and the Association were well aware that the existence of a collective bargaining relationship would preclude the players' antitrust lawsuits. The applicability of the nonstatutory labor exemption was what caused the Association to decertify after its second failed strike, and it is presumably what led the League to insist on recertification and resumption of collective bargaining as part of the settlement. Brown therefore does not constitute a change in the law requiring modification of the settlement agreement.

The League argues that the recertification of the players union, the resumption of collective bargaining, and the diminishing number of original class members who continue to play football constitute circumstances that warrant modification of the settlement agreement. We do not agree, for the first two cannot be considered changed circumstances because they occurred contemporaneously with the execution of the original agreement. At the time the consent decree was entered, the League sought the ability to terminate the settlement if the players failed to ratify a new CBA. See White v. NFL, 836 F. Supp. 1458, 1482 (D. Minn. 1993) (finding that the proposed amendment would have no impact on the class members because a new collective bargaining agreement had already been reached). A basic goal of the settlement was the resumption of the parties' working relationship; collective bargaining and union recertification were both essential means to that end. Similarly, the gradual retirement of class members was anticipated in 1993, as it has been each time the settlement agreement has been amended. When, as here, changed conditions have been anticipated from the inception of a consent decree, they will not provide a

-10-

basis for modification unless the party seeking relief has satisfied a heavy burden of showing that "it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." Rufo, 502 U.S. at 385. The League has made no such showing in this case, and thus the district court did not abuse its discretion in denying the League's Rule 60(b) motion to end the court's oversight.

## B. Recusal

The League also contends that the district judge erred in refusing to recuse himself because of his comments in the press and *ex parte* meetings with Association representatives. We review for abuse of discretion a district court's denial of a motion to recuse. Am. Prairie Constr. Co. v. Hoich, 560 F.3d 780, 789 (8th Cir. 2009). Under 28 U.S.C. § 455(a), a judge is required to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." In analyzing whether recusal is required, we ask "whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." Moran v. Clarke, 296 F.3d 638, 648 (8th Cir. 2002) (quotation omitted). Section 455(a) establishes an objective standard, and the existence of actual bias is irrelevant. Id.

A motion to recuse, however, "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993). We assume the impartiality of a sitting judge and "the party seeking disqualification bears the substantial burden of proving otherwise." United States v. Denton, 434 F.3d 1104, 1111 (8th Cir. 2006). We have also held that a motion to recuse will be denied if it is not timely made. See Holloway v. United States, 960 F.2d 1348, 1355 (8th Cir. 1992). "Timeliness requires a party to raise a claim at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Fletcher v. Conoco Pipe Line Co., 323 F.3d 661, 664 (8th Cir. 2003) (quotation omitted).

The League first takes issue with two newspaper articles, both of which focused on the district judge's role in prompting the 1993 antitrust settlement and contributing to a period of peace and prosperity in professional football. The first article was published on July 10, 2005, in the Colorado Springs Gazette, and entitled "The Peacemaker: Sports' most stable league was forged in Judge David Doty's courtroom." Along with the text, the article featured two large pictures of the district judge in a black robe, holding a football. The story was largely historical, explaining how the antitrust lawsuit developed, came before the district judge, and was settled after the judge convinced League officials to compromise. The article included statements from top NFL and Association officials, including Harold Henderson, the NFL's executive vice president for labor relations. The district judge shared a brief anecdote about cajoling the League into a settlement, and he is quoted as saying that the relationship between the top NFL and Association labor officials should be a model for other sports leagues. Near the end of the article, the district judge is quoted again in the following passage:

> Doty said during one good stretch of negotiations, he said jokingly to the attorneys for each side they did not need him any longer.
>
> "It was just an off-handed comment," Doty said. "But a few days later I received a letter from the owners' group requesting, based on what I said, that I remove myself from matters involving the NFL and the players' union. I laughed at the letter and wrote them a letter kindly denying their request. They would have loved for me to be out of the way. But the letters were good-natured fun."

The second article was published on January 28, 2008, in the Street & Smith's Sports Business Journal, and entitled "NFL's toughest official wields a gavel, not a whistle." It was written to commemorate the twentieth anniversary of the district judge's first major ruling in professional football antitrust litigation. The article recounted much of the same history that appeared in the Gazette story and included

-12-

the district judge's observation that then-NFL Commissioner Paul Tagliabue was "[a] damn good lawyer." The district judge is also quoted in two other passages:

> "[NFL Owners] pretend they're getting beaten around. Well, they did, initially, but they had a position that was not legally sound." Through a league spokesman, Tagliabue declined comment. Said Doty, though, "I think if you ask Tagliabue, he would say, 'The whole thing has come out our way.' Because, even though they complain about it . . . all they've done is make tons of money."

* * *

> [The district judge] admits there's a pinch of ego involved in his retention of the NFL matters. "I could walk away from this case," he said. "But there's one problem: I know that I know too much. They know, including the NFL guys, that they don't have to re-educate me every time they show up here."

In assessing the impact of these comments, we believe the average person would be aware of the fact that the district judge's comments referred to rulings that he made many years earlier and related to matters long since resolved. In these circumstances, we do not believe that the average person would interpret the comments as reflecting bias. The comments focused almost exclusively on the well-documented history of the antitrust settlement and did not address the merits of the Vick proceeding. Viewed in historical context, then, the district judge's comments about the League's desire to shed itself of the district court's oversight and his observations regarding the owners' fiscal success were largely statements of the obvious. The tone of the comments, though perhaps unduly casual, was not derogatory or disrespectful—indeed, the district judge praised the NFL leadership and cited the labor leaders on both sides as examples for other leagues. The fact that he has sometimes sided with the League is part of the district judge's course and pattern of conduct that warrants consideration in the determination of whether his impartiality might reasonably be questioned. See Moran, 296 F.3d at 649.

The League expresses particular concern with the district judge's statement that he laughed at the NFL's request that the court end its oversight, arguing that the comment suggests he did not take the request seriously. But an informed observer would know that the district court responded to the request with an eight-page order that addressed the legal issues that the League raised. To the extent that the district judge's statements were jocular and informal, we believe the average observer would see that as reflective of his down-to-earth approach to resolving the oft-contentious disputes brought to him by the parties.

We recognize that, aside from creating a perception of bias, there is a danger that may flow from even seemingly innocuous statements to the press. Judges should not create the impression that they covet publicity. "[I]n order to be and remain impartial, and to be 'perceived' as impartial, the judge must be above the fray, not become an advocate in it." Mark I. Harrison & Keith Swisher, When Judges Should be Seen, Not Heard: Extrajudicial Comments Concerning Pending Cases and the Controversial Self-Defense Exception in the New Code of Judicial Conduct, 64 N.Y.U. Ann. Surv. Am. L. 559, 583 (2009). When judges make gratuitous public comments on issues closely related to judicial duties, they risk giving the impression that they have "an uncommon interest and degree of personal involvement in the subject matter." Cooley, 1 F.3d at 995. Self-interested behavior in submitting to press interviews may also lead to accusations that a judge will be motivated to decide issues in a way that prompts favorable media attention. Harrison & Swisher, supra, at 583; see also United States v. Microsoft Corp., 253 F.3d 34, 115 (D.C. Cir. 2001) ("Members of the public may reasonably question whether . . . a publicity-seeking judge might consciously or subconsciously seek the publicity-maximizing outcome.").

Certain public comments are also specifically proscribed by Canon 3(A)(6) of the Code of Conduct for United States Judges, which at all times relevant to this case read as follows:

A judge should avoid public comment on the merits of a pending or impending action, requiring similar restraint by court personnel subject to the judge's direction and control. This proscription does not extend to public statements made in the course of the judge's official duties, to the explanation of court procedures, or to a scholarly presentation made for purposes of legal education.[5]

The Code of Conduct, which establishes aspirational rules and relies upon self-enforcement, "does not overlap perfectly with § 455(a) [and] it is possible to violate the Code without creating an appearance of partiality." In re Boston's Children First, 244 F.3d 164, 168 (1st Cir. 2001). The district judge concluded that his remarks to the press did not violate Canon 3(A)(6), because he did not mention Michael Vick or the Atlanta Falcons, the two parties in the underlying dispute. True enough, perhaps, but a broader view of the Canon's prohibition on public comment strikes us as preferable to a narrow, technical reading of the matters included within the Canon's scope. Thus, although we do not believe that the articles created a reasonable perception of bias, within the meaning of § 455(a) or Canon 3(A)(6), the district judge would have been well advised not to opine publicly about his role in enforcing an ongoing consent decree.

With regard to the *ex parte* meetings with Association counsel, there is no evidence that any of them involved discussion of the merits of a proceeding. To the contrary, it appears that, as described earlier, the meetings consisted solely of a brief

---

[5]As of July 1, 2009, Canon 3(A)(6) was revised to read:

A judge should not make public comment on the merits of a matter pending or impending in any court. A judge should require similar restraint by court personnel subject to the judge's direction and control. The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

exchange of pleasantries in chambers when counsel arrived from out of town. Apparently, and for no explained reason, only representatives of the Association have attended these meetings. If there were a policy of greeting only representatives of the Association, such differential treatment could give rise to a perception of bias. On this record, however, we do not believe that any such inference is strong enough to require recusal. Moreover, we are troubled by the League's long delay in raising this issue. Although it has been aware of this practice for a number of years, the League voiced a complaint only after receiving an adverse decision with which it strongly disagrees. A motion to recuse should not be withheld as a fallback position to be asserted only after an adverse ruling. To the extent that the League relies on the *ex parte* meetings, its motion to recuse is untimely.[6] We conclude, therefore, that the district judge did not abuse his discretion in denying the motion to recuse.

## C. The Vick Order

Finally, the League argues that the district court erred in holding that the Falcons could not recover a prorated portion of Vick's roster bonuses for the years he did not play football. "[B]ecause the content of a consent decree is generally a product of negotiations between the parties, decrees are construed for enforcement purposes as contracts." Martin v. Wilks, 490 U.S. 755, 788 n.27 (1989). When, as here, a district court's interpretation of a consent decree is based solely on the written document, we review the court's interpretation *de novo*. United States v. Knote, 29 F.3d 1297, 1299-1300 (8th Cir. 1994). "However, even when interpreting the meaning of a consent decree 'as written,' we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order." Id. at 1300 (citing United States v. ITT Continental Banking Co., 420 U.S. 223, 243 (1975)).

---

[6]The record also suggests that the League was aware of the Gazette story when it was published in 2005, as the article included quotes from top NFL labor officials.

"We therefore give a large measure of deference to the interpretation of the district court that actually entered the decree." Id.

The parties agree that interpretation of the settlement agreement is governed by New York law. The relevant language is found in Article XIV, Section 9(c) of the CBA, which states: "[n]o forfeitures permitted (current and future contracts) for signing bonus allocations for years already performed, or for other salary escalators or performance bonuses already earned." In an earlier decision that the League did not appeal, the district court determined that Section 9(c) creates two distinct forfeiture tests: one for "signing bonus allocations," which may not be forfeited for years already performed; and another for "other salary escalators or performance bonuses," which may not be forfeited if they have already been earned. See White v. NFL (In re Ashley Lelie), No. 4-92-906, 2007 WL 939560 (D. Minn. 2007). The court further held that only the years-performed test turned on whether a player had played football in the relevant years. The already-earned test, in contrast, was met by the satisfaction of any conditions precedent other than performance. The distinction is significant, because it means that bonus money classified as a "signing bonus allocation" may be forfeited if a player does not perform under his contract, whereas a team cannot recoup money that falls into the other categories.

Both parties recognize that under this rubric, the relevant question is whether Vick's roster bonuses should be categorized as "signing bonus allocations," subject to the years-performed test, or "other salary escalators or performance bonuses," subject to the already-earned test. The Association argues that, whatever a roster bonus is, it is not a signing bonus allocation because the terms "roster bonus" and "signing bonus" are commonly understood to refer to two distinct payment arrangements. Logically, therefore, a roster bonus must fall into one of the two categories of compensation subject to the already-earned test. Since Vick satisfied the preconditions of making the eighty-man roster in 2005 and 2006, the Association contends that the money was fully earned.

The League argues, however, that the roster bonuses were actually signing bonus allocations because certain rules governing the salary cap and minimum player salary (1) define the term "signing bonuses" to include roster bonuses in certain circumstances and (2) address a team's choice to convert non-guaranteed compensation into a signing bonus allocation. Specifically, Article XXIV, Section 7(b)(iv) states that "[f]or purposes of determining Team Salary under the foregoing, the term 'signing bonus' shall include . . . any roster bonus or Paragraph 5 Salary that the Club had the right to guarantee for skill, when the Club subsequently exercises the right to guarantee such bonus or Paragraph 5 Salary for skill." Article XXXVIII-A, Section 11 also contains an oblique reference to "convert[ing] non-guaranteed compensation to a signing bonus allocation." Reading the two provisions together, the League argues that a roster bonus is converted into a signing bonus allocation when it is guaranteed for skill. Both of Vick's roster bonuses included an option for the Falcons to guarantee the bonuses for skill, which the team properly exercised. The League argues that once that occurred, the money became a signing bonus allocation, subject to forfeiture for years not performed. The Special Master accepted this characterization and concluded that the Falcons could recover a prorated portion of Vick's bonuses.

The League contends that the district court's contrary decision violated important rules of contract construction, in that it failed to use the language on the salary cap and minimum player salary to interpret the forfeiture provision. See 11 Samuel Williston, Treatise on the Law of Contracts § 32:6 (Richard A. Lord, ed., Supp. 2007) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."); Reda v. Eastman Kodak Co., 233 A.D.2d 914, 915 (N.Y. App. Div. 1996) (noting that a court must make a reasonable effort to harmonize all of the terms in a contract). But this is not a case where a word or phrase has a straightforward meaning in one context that can be directly applied in another. Section 7(b)(iv), on which the League primarily relies, states that its equation of a roster bonus with a signing bonus is "[f]or

purposes of determining Team Salary," and it does not use the phrase "signing bonus allocation." Conversely, the provision on converting non-guaranteed compensation to a signing bonus allocation does not mention roster bonuses. The League's argument amalgamates the two statements to create a third, implicit rule that it applies to Section 9(c). It is not clear that Section 9(c) was drafted with such an interpretation in mind.

Faced with a forfeiture provision that is ambiguous at best, the district court concluded that the League's interpretation was the least logical of the two. As the League would have it, the forfeitability of Vick's bonuses turns on whether the Falcons guaranteed the bonuses for skill. That distinction makes little sense in the context of forfeiture. Guaranteeing a bonus for skill simply means that a player can keep the money no matter how poor his performance. Such a guarantee is clearly germane to regulating team salary because it distinguishes money that is committed to a player from money that is only tentatively slated for distribution. But there is no reason to require forfeiture because a bonus has been guaranteed for skill. Further, the district court correctly observed that the League's position was contrary to the prior, unappealed holding in Lelie, in which the court refused to use the salary cap and minimum player salary rules to interpret Section 9(c).

Affording the district court a measure of deference as the court that entered the consent decree and has overseen each of the subsequent amendments, we conclude that it properly rejected the League's argument that Vick's roster bonuses were signing bonus allocations subject to the years-performed test. Accordingly, the district court did not err in determining that the bonuses were earned when Vick met the roster provisions in his contract, and thus not subject to forfeiture.

The judgment is affirmed.

_____

-19-