# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-2127
_____

United States of America; State of Arkansas

*Plaintiffs - Appellees*

v.

City of Fort Smith, Arkansas

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Arkansas - Ft. Smith
_____

Submitted: February 15, 2022
Filed: September 14, 2022
_____

Before SMITH, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

SMITH, Chief Judge.

On April 6, 2015, the district court[1] entered a Consent Decree between the City of Fort Smith, Arkansas (the City), and the United States Environmental Protection

---

[1]The Honorable P. K. Holmes, III, United States District Judge for the Western District of Arkansas.

Agency (EPA) along with the State of Arkansas.[2] The Consent Decree imposed various sewer system improvement requirements on the City over an initial 12-year period. The Consent Decree sought to bring the City's sewer system into compliance with the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1251 et seq., and to prevent untreated effluent from its sanitary sewers from overflowing into the waters of the United States and the State of Arkansas. The Consent Decree's requirements generally include (1) assessing the condition of the sewer system, (2) identifying control measures to address certain defects, and (3) developing a plan to ensure adequate capacity in the sewer system.

The parties eventually entered a dispute resolution process to clear up certain discrepancies in the respective parties' interpretation of the Consent Decree's requirements. Unable to resolve the dispute by that process, the City filed a motion for judicial resolution. The district court granted the City's motion and issued two orders on March 19, 2021, and April 30, 2021. The City now appeals those two orders, challenging the court's ruling that certain severe structural defects had to be repaired by a date certain. We affirm.

I. *Background*

The CWA seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301 of the CWA requires any discharge of pollutants to be in compliance with a National Pollutant Discharge Elimination System (NPDES) permit issued by the EPA or an authorized state. *Id.* §§ 1311(a), 1342. Such permits limit the amounts and types of pollutants that may be discharged and impose certain operating, monitoring, and reporting requirements. 33 U.S.C. § 1311 ("Effluent limitations"); 40 C.F.R. § 122.41

---

[2]The United States and the State of Arkansas are co-appellees. However, since the State has not submitted briefing, we will refer only to the United States (the government) when analyzing the parties' arguments.

("Conditions applicable to all permits"); 40 C.F.R. § 122.25(a)(12) (making the § 122.41 conditions applicable to state-issued permits). The State of Arkansas is authorized to issue NPDES permits within its borders. Approval of Arkansas' NPDES Program, 51 Fed. Reg. 44,518 (Dec. 10, 1986). The United States may enforce NPDES permits issued by states through actions for injunctive relief and civil penalties. 33 U.S.C. § 1319(b), (d).

The Consent Decree states that it "shall have the objective of causing [the City] to achieve and maintain full compliance with the Decree, the CWA, the regulations promulgated under the CWA, and [the] City's NPDES Permits, including the goal of eliminating all [sanitary sewer overflows or] SSOs."[3] R. Doc. 12, at 9. Pursuant to these objectives, the Consent Decree imposes several requirements on the City.

First, it requires the City to conduct Sewer System Assessments (SSAs), whereby the City inspects a portion of its sewer system every year and records any structural defects of the sewer lines and manholes in the inspected area. The SSA process is described in Appendix A to the Consent Decree. An SSA also rates the defects according to a system developed by the National Association of Sewer Service Companies (NASSCO). The NASSCO condition ratings system grades each sewer defect on a scale from 1 to 5 in ascending order of severity. A Grade 5 pipe segment "has failed or will likely fail within the next five years" and "requires immediate attention." *Id.* at 124. Similarly, a Grade 5 manhole is one where "[f]ailure has already occurred or is likely to occur." *Id.* at 126. A Grade 4 pipe segment "has severe defects with the risk of failure within the next five to ten years," *id.* at 124, and a Grade 4 manhole is one where "[c]racks, deterioration, [and] visible deformities [are] observed," *id.* at 126.

---

[3]Sanitary sewer overflow (SSO) is not defined in the CWA. Rather, it is defined in the Consent Decree as "any spill, release, or diversion of sewage from" the City's sewer system. R. Doc. 12, at 18.

By comparison, pipe segments and manholes assigned Grades 1, 2, and 3 have less severe defects. A Grade 3 pipe segment is one with "moderate defects" and that "may continue [to deteriorate], but not for 10 to 20 years," while Grades 1 and 2 have "minor defects" and are "unlikely [to fail] in the foreseeable future" or "for at least 20 years," respectively. *Id.* at 124–25. With respect to both manhole and pipe defects, Appendix A further specifies a "[l]ikely [o]utcome" for each Grade: "[r]emedial [d]esign" for Grades 4 and 5 and "[a]dd into CMOM[4] program" for Grades 1 through 3. *Id.* at 124, 125, 126.

Second, the City is required to submit an annual Condition Assessment Report to the Arkansas Department of Energy and the Environment, Division of Environmental Quality (ADEQ), and to the EPA. This report includes the defects uncovered in conducting its SSA and their grades according to the NASSCO ratings system.

Third, the City is required to develop a Remedial Measures Plan (RMP) to address some of the sewer system defects that it identified in its SSA and graded in its Condition Assessment Report. The City must then submit each RMP to the EPA and to the ADEQ for review and approval.

Paragraph 18 of the Consent Decree is entitled "Condition Remedial Measures from SSA Activities Performed after Date of Lodging"[5] and sets forth the RMP process. *Id.* at 26 (emphasis omitted). This paragraph reads in part:

---

[4]"Capacity, Management, Operations, and Maintenance" or "CMOM" is defined as "a program of accepted industry practices to properly manage, operate and maintain sanitary sewer collection, transmission and treatment systems, investigate capacity-constrained areas of these systems, and respond to SSO events." *Id.* at 11–12.

[5]The date of lodging was January 2, 2015.

After completing the SSA activities and following the process presented in Appendix D for the period from the Date of Lodging through December 31, 2015, and for every Calendar Year thereafter, [the] City shall develop a Remedial Measures Plan for all Pipe Segments and manholes discovered through that SSA to be rated 4 or 5 in accordance with the NASSCO condition rating systems (as set forth in Appendix A), and/or discovered to have other defects that have caused or significantly contributed to previous SSOs or that are likely to cause or significantly contribute to the future occurrence of SSOs.

*Id.* (emphasis omitted). Appendix D includes a decision tree titled "REMEDIATION DETERMINATION PROCESS." *Id.* at 133–34. The decision tree sets forth a process for evaluating the relationship between defects and SSOs and for determining how to address such defects. As relevant here, the decision tree divides sewer line and manhole defects into two groups: (1) defects connected to known or predicted SSOs and (2) defects connected with "[v]erified SSOs." *Id.* at 134. Of the former group, it then asks whether such defects will likely cause or contribute to a future SSO. If a future SSO is likely, then the decision tree routes the defect into a box titled "Remedial Measure Alternative Analysis" (RMAA). *Id.* If an SSO is unlikely, then the defect is assigned to the City's CMOM program. CMOM consists of a program of open-ended monitoring and maintenance and acts as an alternative to full rehabilitation by replacement or repair. The decision tree routes all defects connected with "[v]erified SSOs" into RMAA. *Id.*

As described in the Appendix D decision tree, the purpose of RMAA is to identify "the most practical solution and timeframe for eliminating [the] SSO" caused by the defect. *Id.* The RMAA box lists several alternatives to addressing the defects, including such "[s]olutions and techniques" as point repairs, rehabilitation, and replacement. *Id.* One such approach—listed twice in the RMAA box, once in relation to "Gravity Sewer Mains" and once in relation to "Manholes"—is "Monitoring or Maintenance Analysis: performed as part of CMOM." *Id.* The decision tree further

instructs that after conducting RMAA, and on the basis thereof, the City should "[p]repare [the] Remedial Measures Plan." *Id*. The solutions and techniques selected by the City must then be documented in the RMP and submitted to the EPA and the ADEQ for review and approval.

Paragraph 18 of the Consent Decree further specifies that "[a]ll Remedial Measures enumerated in each Remedial Measures Plan shall be completed as soon as technically feasible, but no later than December 31st of the fourth Calendar Year following the Calendar Year in which the SSA that identified the need for those Remedial Measures was performed." *Id.* at 26. More generally, all remedial work required by the Consent Decree must be completed "no later than twelve (12) years after the Date of Lodging," i.e., no later than January 2, 2027. *Id.* at 20.

Another relevant provision of the Consent Decree instructs that "[a]ny conflict between the language in the body of the Consent Decree and the language in an appendix should be resolved in favor of the language in the body of the Decree." *Id.* at 114.

This case requires us to interpret the Consent Decree. Specifically, it concerns determining what solutions the City may employ under the RMP for Grades 4 and 5 defects. The City argues that some such defects may be addressed with CMOM in accordance with the available remediation options given in RMAA. The government disagrees, arguing that under Paragraph 18 all Grade 4 and 5 defects must be repaired by a date certain, which would foreclose the possibility of addressing any of them with CMOM.

The parties brought the dispute to the district court. Upon due consideration, the district court issued two orders resolving the case. The first order, issued March 19, 2021, identified the sewer/manhole defects that must be included in the City's annual RMPs. Following issuance of the decision, the City filed a "Motion Seeking

-6-

Clarification of that Portion on the Court's Opinion and Order Filed March 19, 2021 Regarding Interpretation of Paragraph 18 of the Consent Decree." R. Doc. 46, at 1 (all caps omitted). In an April 30, 2021 order, the court rejected the City's arguments that the Consent Decree allowed the City to monitor Grade 4 and 5 defects under its CMOM plan and held that it must repair them within a four-year timeframe as the government had argued. In particular, the court concluded that "Paragraph 18 requires Grade 4 and 5 defects be added to the Remedial Measures Plan, along with lower-graded defects required by the decision tree in Appendix D." *United States v. City of Fort Smith*, No. 2:14-cv-02266-PKH, 2021 WL 1738881, at \*1 (W.D. Ark. Apr. 30, 2021). It accepted the government's argument that the decision tree did not apply to defects rated 4 and 5. The court further concluded:

> To the extent there is any ambiguity in the terms of the Consent Decree regarding the treatment of Grade 4 and 5 manholes and sewer lines, the Court resolves it as follows: all Grade 4 and 5 manholes and sewer lines must be addressed by remedial measures, which are clearly defined in the Consent Decree as active measures to "resolv[e] condition deficiencies and/or capacity deficiencies," rather than just passively monitor them.

*Id.* at \*2 (alteration in original) (quoting R. Doc. 12, at 18). And the court summarized its ruling: "In short, Grade 4 and 5 manholes and gravity sewer lines—suffering from condition deficiencies by definition—must be repaired or replaced. This interpretation complies with the Consent Decree and better furthers its stated objective of 'eliminating all SSOs.'" *Id.* (quoting R. Doc. 12, at 9).

## II. *Discussion*

The City appeals the court's March 19, 2021 and April 30, 2021 orders, seeking review of one issue addressed in those orders. In particular, it challenges the court's conclusion that certain severe structural defects must be repaired by a date

certain. The City contends that the Consent Decree permits defects to be addressed with a program of open-ended monitoring and maintenance.

Before addressing the City's arguments, we must first decide whether we have jurisdiction to review both orders.

## A. *Jurisdiction*

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 because the dispute arose under the CWA, 33 U.S.C. §§ 1251 et seq., and the United States is a plaintiff. Moreover, the Consent Decree provides that the district court retained jurisdiction to resolve disputes as to its construction. R. Doc. 12, at 110; *cf. Picon v. Morris*, 933 F.2d 660, 662 (8th Cir. 1991) ("Ordinarily, a district court retains the inherent authority to modify or enforce a consent decree. This is true even without a provision in the decree which provides for continuing jurisdiction." (citations omitted)).

A district court's order interpreting the obligations of parties to a consent decree is final. *United States v. Knote*, 29 F.3d 1297, 1299 (8th Cir. 1994). Thus, both the March 19 and April 30 orders are final and appealable. The City's notice of appeal designates only the April 30 order for appeal. R. Doc. 51, at 1. Under Federal Rule of Appellate Procedure 3(c)(1)(B), a party must "designate the judgment—or the appealable order—from which the appeal is taken" in the notice of appeal.

> Although we liberally construe notices of appeal, we cannot waive the jurisdictional requirements of Rule 3, and "a notice which manifests an appeal from a specific district court order or decision precludes an appellant from challenging an order or decision that he or she failed to identify in the notice."

*Stephens v. Jessup*, 793 F.3d 941, 943 (8th Cir. 2015) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1058 (8th Cir. 2002)).

However, even if a notice of appeal is "technically at variance with the letter of a procedural rule, a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires." *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316–17 (1988). "The Eighth Circuit traditionally construes notices of appeal liberally, but the intent to appeal the judgment in question must be apparent and there must be no prejudice to the adverse party." *Burgess v. Suzuki Motor Co.*, 71 F.3d 304, 307 (8th Cir. 1995).

The City's notice of appeal states that the City appeals the April 30 order, which denied the City's "Motion . . . Seeking Clarification of that Portion of the Court's Opinion and Order Filed March 19, 2021 Regarding Interpretation of Paragraph 18 of the Consent Decree." R. Doc. 51, at 1. Thus, the intent to appeal the first order, as the City's brief states, is readily apparent from the notice of appeal.[6] *See* Appellant's Br. at 1 ("The City . . . appeals two orders . . . construing the [p]arties' Consent Decree."). Further, the government concedes in its opening brief that it would not be prejudiced by our review of the first order. Appellee's Br. at 4–5; *cf. Burgess*, 71 F.3d at 307 (adverse party must prove prejudice). The City timely appealed the April 30 order. *See* Fed. R. App. P. 4(a)(1)(B)(i). Hence, we have jurisdiction to review both orders.

## B. *Consent Decree Interpretation*

"When, as here, a district court's interpretation of a consent decree is based solely on the written document, we review the court's interpretation de novo." *White v. Nat'l Football League*, 585 F.3d 1129, 1141 (8th Cir. 2009). "Because the content of a consent decree is generally a product of negotiations between the parties, decrees are construed for enforcement purposes as contracts." *Id.* (cleaned up). Therefore, "[i]n reviewing a district court's interpretation of a consent decree, we . . . look to

---

[6]This is also evident from the procedural history of the case. *See McAninch v. Traders Nat'l Bank of Kan. City*, 779 F.2d 466, 467 n.2 (8th Cir. 1985).

rules of contract interpretation." *Knote*, 29 F.3d at 1299. "[G]uided by principles of contract interpretation," we will, "where possible, . . . discern the parties' intent from the unambiguous terms of the written consent decree, read as a whole." *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958 (8th Cir. 2002),

"However, even when interpreting the meaning of a consent decree 'as written,' we are not to ignore the context in which the parties were operating, nor the circumstances surrounding the order." *Knote*, 29 F.3d at 1300. But where, as here, "the district court that interpreted the consent decree is the same court that originally entered the consent decree," that "inclines us further to adopt the district court's interpretation of the . . . Consent Decree." *Sigma Chi*, 312 F.3d at 959 (citing *Knote*, 29 F.3d at 1300).

The City argues that, under Paragraph 18 and Appendix D, it may place certain Grade 4 and 5 structural defects, which in its assessment have little risk of causing SSOs in the near future, in its CMOM program and accordingly monitor them for an open-ended period of time. The City avers that remedial actions undertaken elsewhere in the system have alleviated the capacity burdens upon certain severe defects. Therefore, the City argues that some admittedly severe defects are not likely to contribute to a near-future SSO. The City desires to defer repair of such defects, allowing it to reduce costs in the near term and to focus its attention on repairing the most pressing issues with its sewage system. The City argues that the inclusion of CMOM as an option within RMAA permits the City to delay repair of some of these defects and simply monitor them indefinitely. If correct, the City's interpretation would effectively erase Paragraph 18's requirement that all such defects be remedied by a date certain.

The government for its part contends that all Grade 4 or 5 defects must be repaired within four years of discovery as per the requirements of Paragraph 18. The

government argues, and the district court found, that the Appendix D decision tree does not apply to Grade 4 or 5 defects at all but only to Grades 1 to 3.

Nothing in the Consent Decree or in Appendix D explicitly indicates that the decision tree only applies to defects with Grades 1 to 3 and not to Grades 4 and 5. But assuming *arguendo* that it applies to all defects identified in the City's SSA irrespective of grade, Appendix D conflicts with Paragraph 18. Paragraph 18 provides that all Grade 4 and 5 defects must be included in the RMP. It further requires that "[a]ll Remedial Measures enumerated in each Remedial Measures Plan shall be completed . . . no later than December 31st of the fourth Calendar Year following the Calendar Year in which the SSA that identified the need for those Remedial Measures was performed." R. Doc. 12, at 26. Requiring completion by a date certain presupposes that all Remedial Measures can be completed. CMOM consists of open-ended monitoring and maintenance. On the other hand, Remedial Measures, as the district court observed, "are clearly defined in the Consent Decree as active measures to 'resolv[e] condition deficiencies and/or capacity deficiencies,' rather than just passively monitor them." *City of Fort Smith*, 2021 WL 1738881, at *2 (alteration in original) (citing R. Doc. 12, at 18). A conflict therefore exists between the requirements of Paragraph 18 of the Consent Decree requiring all Remedial Measures to be completed by a date certain and what Appendix D apparently allows, that some Remedial Measures may continue past such date.

The Consent Decree provides that "[a]ny conflict between the language in the body of the Consent Decree and the language in an appendix should be resolved in favor of the language in the body of the Decree." R. Doc. 12, at 114. Paragraph 18's requirements therefore supersede those of Appendix D. So, even if we accept the City's argument that the Appendix D decision tree applies to defects of every grade, CMOM would still not be a permissible manner of addressing Grade 4 or 5 defects, all of which must be remedied within four years of the calendar year in which they were discovered according to Paragraph 18. While we normally aim to avoid

constructions that render language in an agreement "mere surplusage," *Harris v. The Epoch Grp. L.C.*, 357 F.3d 822, 825 (8th Cir. 2004), here, the Consent Decree itself provides the proper course when confronted with such a prospect, and we must give effect to its unambiguous terms, *see Sigma Chi*, 312 F.3d at 958. We affirm the conclusion of the district court that "[t]he Consent Decree requires the City to resolve the defects in Grade 4 and 5 manholes and sewer lines, and this cannot be accomplished solely by monitoring and maintenance analysis." *City of Fort Smith*, 2021 WL 1738881, at *2.

## III. *Conclusion*

Accordingly, we affirm the district court.

_____