# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2915

_____

Jasper Mays, Reverend, on behalf of minors Rodney O'Neill Mays and Timothy Arnell Mays, By next friend Rodney O'Neill Mays, By next friend Timothy Arnell Mays; Pamela Taylor, on behalf of infants Yolanda Taylor, Paul Taylor and April Taylor, By next friend Yolanda Taylor, By next friend Paul Taylor, By next friend April Taylor; Charlie Fay Moore, on behalf of Keno Moore and Lavyonne Moore, By next friend Keno Moore, By next friend Lavyonne Moore; Rosie Dunn, on behalf of Keshia Dunn and Alice Dunn, By next friend Keshia Dunn, By next friend Alice Dunn; Marzell Morrison, on behalf of minors Tequila Orange and Corey Orange, By next friend Tequila Orange, By next friend Corey Orange; Shanda Conley; Makeda Dunn; Tina Dunn; Debbie Mooney; April Moore; Kastrina Robinson; Mary Butler; Sammie Butler; Ella Mae Collins; Rita Moore; Kim Penn; Carl Robinson; Larry Waters

*Plaintiffs - Appellants*

v.

The Board of Education of the Hamburg School District, a public body corporate; Charles F. Allen, Superintendent of Schools of the Hamburg School District

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Arkansas - El Dorado

_____

Submitted: June 16, 2016
Filed: August 24, 2016

_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.

SMITH, Circuit Judge.

A group of parents, patrons, and students ("plaintiffs") of the Hamburg School District ("District") appeal the district court's[1] order granting the District's motion to approve the closure of the Wilmot Elementary School ("Wilmot") and to modify the gifted and talented (GT) requirements for the District. We affirm.

## I. *Background*

In 1988, the plaintiffs sued the Arkansas Department of Education (ADE), the Director of the ADE, the District's Board of Education ("Board"), and the District's superintendent under 42 U.S.C. § 1983, alleging race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and violations of § 2 of the Voting Rights Act of 1965. As the district court accurately summarized, the plaintiffs challenged the following policies and practices within the District:

> (1) the low number of African-American administrators, teachers, and coaches in the district resulting from discriminatory recruitment and hiring practices (¶ 6, 15); (2) the election of school board members on an at-large basis (¶ 7); (3) the segregation of African-American and Caucasian students resulting from standardized testing for class placement (¶ 8); (4) a racial imbalance at Wilmot Elementary resulting from the district's decision to allow students from the Wilmot attendance zone to attend Hamburg schools (¶ 9); (5) the disproportionate assignment of African-American students to special education classes, and the disproportionate assignment of Caucasian students to Gifted and Talented classes (¶ 10); (6) student discipline imposed on a racially discriminatory basis (¶ 11–12); and (7) the disproportionate number of African-American children held back in the first grade (¶ 13–14).

_____

[1]The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas.

Plaintiffs requested both injunctive relief and damages based on the above allegations.

*Mays v. Ark. Dep't of Educ.*, No. 1:88-CV-1076, 2015 WL 4528935, at \*1 (W.D. Ark. July 27, 2015).

The parties negotiated a settlement. On March 6, 1991, the plaintiffs dismissed their claims against the ADE and its director. On August 1, 1991, by agreement of the parties, the district court entered an order dividing the District into seven single-member zones for the purpose of electing school board members. Thereafter, the plaintiffs settled their claims against the District's Board and its superintendent, and on September 23, 1991, the district court entered a "Consent Order" disposing of the remaining issues raised in the complaint. In relevant part, the Consent Order addressed the functioning of the District's GT program; it provides, in relevant part, as follows:

> Beginning with the 1991–92 school year and continuing thereafter, all Gifted and Talented Programs for elementary students, run by the district, will be held exclusively at the Wilmot School. A number of educational and desegregative benefits will flow from this arrangement. By locating this program in the Wilmot [S]chool, many black elementary students will be relieved of some of the disparate burden of busing/travel which could attend their education in the higher grades since Wilmot does not have an educational presence beyond the 6th grade. Additionally, because of the special opportunities offered through G & T, white and black students from throughout the district will be encouraged to attend the Wilmot facility. The resulting influx of white and black students from throughout the district for gifted and talented programs will tend to desegregate the educational experience at Wilmot.

The Consent Order does not set forth a blueprint for the District's implementation of the GT program at Wilmot. The District chose to implement a GT "pull-out" program in which GT students would be pulled out of their regular classrooms for 150 minutes of GT instruction per week. Students attending other

elementary schools within the District—Noble/Allbritton Elementary ("Noble/Allbritton") and Portland Elementary ("Portland")—are bused to Wilmot one day per week for GT instruction. Sandra Oliver, the GT Coordinator for the District, testified that a bus first picks up the Noble/Allbritton GT students at 9:15 a.m., then picks up the Portland GT students, and arrives at Wilmot at approximately 10:15 a.m. The Noble/Allbritton and Portland GT students later depart Wilmot at 1:30 p.m. As the district court noted, "The GT program appears to have operated in this way—as a pull-out program—from the 1991–1992 school year to the present." *Mays*, 2015 WL 4528935, at *2.

The district court retained jurisdiction over the instant case to ensure compliance with the Consent Order. In 1994, the District moved for approval of a zone plan to voluntarily annex the Parkdale School District ("Parkdale") into the District. The City of Parkdale is located eight miles from the City of Portland and four miles from the City of Wilmot; at the time of the annexation, it was a nearly-all-black school. The plaintiffs did not oppose this motion, and the district court approved the rezoning on August 26, 1994. The rezoning added Parkdale to the Wilmot attendance zone, roughly doubling its size.

Ten years later, in 2004, the District moved to dismiss this case citing its compliance with the court's prior orders or, in the alternative, to approve annexation of the Fountain Hill School District ("Fountain Hill") into the District. By agreement of the parties, the district court entered an order approving the District's alternative motion to annex Fountain Hill but denied the District's motion to dismiss the case.

On March 9, 2005, the District moved for the district court's approval to rezone the District into nine zones, modify the GT requirements, and permit intradistrict zone transfers. The motion provided that the rural portions of the District, which included Wilmot, had suffered tremendous population loss. According to the District, this population decline had "resulted in an inequitable, inefficient allocation of students

and resources throughout the district." The District asked the district court to modify the Consent Order to relieve the District from its obligation to strictly adhere to attendance zones and operate the GT program exclusively at Wilmot. The plaintiffs opposed the motion. Following a hearing on the motion, the parties reached an agreement and submitted stipulations for the court's approval. The district court entered an amended order approving the stipulations on June 24, 2005. Relevant to the present case, the amended order provides as follows concerning the GT program:

> [T]he parties have agreed to defer any decision on this matter until after the school board election in September 2005. In the event that the Board determines that its elementary level gifted and talented program should be modified, the Plaintiffs have agreed that they will support the Board's decision, provided that it is justified by legitimate reasons of educational benefits and financial feasibility. Any such changes shall be adopted only after a public hearing is held upon at least 20 days notice which sets out the proposed changes in detail.
>
> Therefore, the Court finds that this matter is moot at this time and hereby denies Defendant's motion as it relates to the modification of the district's elementary level gifted and talented program.

The case remained dormant until January 10, 2014. On that date, the District moved to reopen the case and requested approval of the closure of Wilmot and to modify the GT requirements. In its motion,[2] the District argued that "substantial

---

[2]The district court held a hearing on the motion on June 10 and June 18, 2014. On the second day of the hearing, the parties indicated that they wanted to hold a settlement conference with a magistrate judge. The district court adjourned the hearing, and the parties participated in a settlement conference on August 18, 2014. The parties failed to reach an agreement. As a result, Wilmot remained open for the 2014–2015 school year. The District filed an updated motion regarding the modification of the GT requirements and the closure of Wilmot for the 2015–2016 school year. This updated motion was the subject of the district court's order approving Wilmot's closure.

changes in composition of the [District]" have occurred since entry of the Consent Order in 1991. The District noted such changes as the consolidation of the former Fountain Hill and Parkdale School Districts into the District. The District asserted that Wilmot had experienced "declining enrollment and increases in expenses."

According to the District's motion, it began discussions of closing Wilmot due to declining enrollment at a Board meeting on November 12, 2012. Thereafter, it held a public forum on December 4, 2012, concerning the closure of Wilmot. At this public forum, which was publicized in a local paper, the public was permitted to comment on the potential closure of Wilmot. At a February 11, 2013 Board meeting, the Board voted to leave Wilmot open and combine grades K–1, 2–3, and 4–5 into three classrooms. One teacher and one paraprofessional was assigned to each combined class. A second public forum concerning Wilmot's closure was held on November 18, 2013. At the scheduled Board meeting held that same day, the Board unanimously voted to close Wilmot at the end of the 2013–2014 school year.[3] The Board decided to give Wilmot students the option to attend either Noble/Allbritton or Portland. According to the District, "[t]he Board's decision to close the Wilmot Elementary campus is justified by legitimate reasons of educational benefits and financial feasibility." (All caps omitted.)

The plaintiffs opposed the closure of Wilmot, arguing that no changed circumstances justify closing Wilmot or moving the GT program from that campus. The plaintiffs additionally argued that the manner in which the District conducted the GT program at Wilmot was not in compliance with the Consent Order. According to the plaintiffs, this noncompliance caused Wilmot's declining numbers.

_____

[3]As explained *supra*, the District ultimately did not close Wilmot after the 2013–2014 school year due to the present litigation over the closure.

Following a two-day hearing on the District's motion to approve the closure of Wilmot and to modify the GT requirements, the district court granted the motion. The court concluded that the District established that "a significant change in circumstances" had occurred since the entry of the Consent Order in 1991. *Mays*, 2015 WL 4528935, at *5. First, the court discussed the "changing demographics in the area" that have "hindered" "[t]he goals of the 1991 Consent Order." *Id*. The court focused on the population downturn in the City of Wilmot, citing United States Census Bureau statistics. *Id*. In 2000, the City of Wilmot's total population was 786, and "[t]he population of 5–14-year-olds was 118." *Id*. In 2010, the total population declined to 550, and "the population of 5–14-year-olds dropped to 83." *Id*. The district court assumed, based on Wilmot's current enrollment, that the City of Wilmot's "population has continued to decrease since 2010." *Id*. The court found that the data indicated "a consistent downturn in population since the Consent Order was entered in 1991." *Id*. According to the court, the plaintiffs failed to offer evidence that the trend in declining population would not continue. *Id*. The court observed that the City of Wilmot's population loss "appear[ed] to have prevented Wilmot Elementary from sustaining its enrollment and/or attracting new families with children to the area." *Id*.

Second, the court found that "Wilmot's enrollment numbers have dropped drastically since the Consent Order was entered, and its financial status has been heavily impacted as a result." *Id*. at *6. As a result, the court found that the District satisfied its burden of "showing that the continued operation of Wilmot is a significant financial hardship on the district." *Id*. The court explained that

> [e]nrollment at Wilmot dropped from 81 students for the 2011–2012 school year to 59 students for 2012–2013. Enrollment further decreased to 42 students for the 2013–2014 school year and increased to 49 students in 2014–2015. For the 2012–2013 school year, Wilmot operated at a deficit of $206,063.98 with a per student expenditure of $10,303.19. ([District] Exh. 15). The per student expenditure in 2012–2013 exceeded Wilmot's per student funding by $3,492.61. ([District] Exh. 21). For the

-7-

2014–2015 school year, with three combined classes of grades K–1, 2–3, and 4–5, Wilmot operated at a deficit of $126,588.23. ([District] Exh. 16). Superintendent Max Dyson testified at the hearing that Wilmot's yearly deficits are not sustainable. He identified the operation of Wilmot Elementary as the primary source of the Hamburg School District's financial deficits.

*Id.* at \*5 (footnote omitted). The court compared Wilmot's enrollment and expenditures with that of Portland and Noble/Allbritton. *Id.* at \*5 n.6. In 2012–2013, Portland had an enrollment of 131 students and operated with a $132,499.96 surplus. In 2014–2015, Portland operated with a $224,518.48 surplus. *Id.* In 2015, "Noble/Allbritton operated with a $6,405.37 cost per student; Portland operated with a $7,295.99 cost per student; and Wilmot operated with a $13,254.05 cost per student. *Id.* Based on the comparison of the various schools' financial data, the court concluded that "[t]he goals of the Consent Order—that the educational experience in the [District] occur on a desegregated basis—are not being served by Wilmot's continued operation in the face of major financial strain to the [D]istrict." *Id.* at \*6.

After considering the declining enrollment and financial considerations, the court addressed "educational considerations." *Id.* at \*5. The court acknowledged that "the Wilmot students are currently testing at or near the same levels" as the Noble/Allbritton and Portland students. *Id.* The student-to-teacher ratio is 8:1 at Wilmot, while the student-to-teacher ratio is 19:1 at Noble/Allbritton and 18:1 at Portland. *Id.* Despite the smaller class sizes at Wilmot, the court found "some indications that the combined classroom setting at Wilmot has presented challenges for the teachers." *Id.* The court cited Board minutes showing "that the Wilmot teachers feel that 'there is not enough time in the day to teach both grades.'" *Id.* (quoting District Exhibit 14). From this evidence the court concluded that "the combined grades classroom configuration has put a strain on the teachers who are faced with teaching a full curriculum to two different grades every day." *Id.* at \*6. The court

concluded that "combined grades are not an ideal situation where there are viable alternatives." *Id.*

Additionally, the court cited the District's "concern[s] that the Wilmot students in these extremely small classroom environments are not being sufficiently challenged in terms of classroom competition and are not being exposed to other cultural viewpoints that might exist in a larger classroom setting" and that the isolated nature of Wilmot's campus deprives the Wilmot students of "the opportunity to participate in after-school tutoring, remediation, and other programs that are available at other campuses." *Id.* at *5. The court concluded that Wilmot students would "benefit from the more desegregated, diverse environments that [Noble/Allbritton and Portland] offer" and that such campuses would provide the Wilmot students with "[a] racially balanced and culturally diverse educational environment [that] was the goal of the 1991 Consent Order." *Id.* at *6.

The court then focused on Wilmot's GT program, citing the District's evidence that "a handful of students have declined to participate in the program despite having been accepted." *Id.* (citing District Exhibit 65A). Specifically,

> [f]or 2010–2011, it was noted that twelve students did not turn in forms that would have given the school district permission to test them for entry into the GT program. The transportation challenges for GT students have likely contributed to a lack of participation. GT students travel by bus to Wilmot, departing Noble/Allbritton at 9:15 a.m., picking up GT students at Portland Elementary, and arriving at Wilmot Elementary at approximately 10:15 a.m. The GT students from Noble/Allbritton and Portland then depart Wilmot Elementary at 1:30 p.m[.] and return to their regular classes between 2:00–2:30 p.m. Due to their participation in the GT program and the bus ride, Noble/Allbritton and Portland GT students are absent for 1–2 hours of regular classroom instruction per week.

*Id*.

Based on the aforementioned evidence, the district court found "that a modification of the Consent Order is justified due to the substantial changes that have come to the Wilmot campus in the 24 years since the Consent Order was entered." *Id*. The court concluded that the Board's "unanimous vote to close the Wilmot campus was based upon legitimate financial and educational concerns" and therefore found "that the proposed modification to the GT program is suitably tailored to the changed circumstances at Wilmot Elementary and will comply with the goals of the Consent Order." *Id*. As a result, the court granted the District's motion for approval to close Wilmot and amended the Consent Order "to relieve the Hamburg School District from its obligation to hold its Gifted and Talented elementary program exclusively at the Wilmot Elementary campus." *Id*. at *7.

## II. *Discussion*

On appeal, the plaintiffs contend that the District failed to prove that "the facts and circumstances as they existed in 1991 or 2005 had changed in a significant enough way that Wilmot should be closed." The plaintiffs also assert that the District acted in bad faith and "willfully ignored most of the provisions of the 1991 [C]onsent [D]ecree and made material changes to the programs at Wilmot without seeking the approval of the district court."

We review "the district court's modification of the decree for abuse of discretion." *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 568 (8th Cir. 2014) (citation omitted).

"Rule 60(b) of the Federal Rules of Civil Procedure authorizes modification of consent decrees." *Id*. at 570 (citing *Rufo v. Inmates of the Suffolk Cty. Jail*, 502 U.S. 367 (1992)). This rule "provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not

when it is no longer convenient to live with the terms of a consent decree." *Id.* (quoting *Rufo*, 502 U.S. at 383 (quoting Fed. R. Civ. P. 60(b)(5))). As a result, the Supreme Court has explained that "a party seeking modification [must establish] that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances." *Id.* at 570–71 (alteration in original) (quoting *Rufo*, 502 U.S. at 383); *see also id.* at 573 ("The *Rufo* standard has two essential elements, whether 'a significant change in circumstances warrants revision of the decree,' and if so, 'whether the proposed modification is suitably tailored to the changed circumstances.'" (quoting *Rufo*, 502 U.S. at 383).[4]

## A. *Significant Change in Circumstances*

To satisfy the first *Rufo* element, the District had to "establish 'a significant change in circumstances,' not merely that 'it is no longer convenient to live with the terms of [the] consent decree.'" *Smith*, 769 F.3d at 573. We have previously held that

> *dramatic demographic changes*, *significant cost savings*, *a projected decrease in enrollment*, *a risk of fiscal distress* noted by the Arkansas Department of Education's Fiscal Distress Accountability and Reporting Unit, "academic shortcomings" cited by the Department, and evidence that placing all grade levels on the same campus would likely improve

---

[4]The plaintiffs argue that "the more rigorous test for termination of a desegregation decree set forth in *Freeman v. Pitts*, 503 U.S. 467, 490–91, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992)," applies. *See id.* at 568. "[T]he primary difference between [the *Rufo* and *Freeman*] standards is that the *Rufo* test lacks *Freeman*'s explicit focus on the moving party's good faith as to both past and future compliance with the consent decree." *Id.* at 571. The plaintiffs acknowledge that, in *Smith*, we rejected the argument that *Freeman* applies to the modification of a consent decree. *See id.* at 571–73. Because "one panel of this Court is not at liberty to overrule an opinion filed by another panel," *Brown v. First Nat'l Bank in Lenox*, 844 F.2d 580, 582 (8th Cir. 1988), the *Rufo* standard applies to the present appeal.

the *academic performance* of middle school students—together with the court's finding "that defendants have complied in good faith with the remainder of the requirements set forth in the consent decree," were a sufficient basis for [a] [district] court to conclude that [a] [school] [d]istrict had demonstrated the requisite "significant change of circumstances."

*Id*. (emphases added).

Here, the district court cited factors similar to those considered in *Smith*, including (1) demographic changes, (2) fiscal considerations, (3) decrease in enrollment, and (4) educational considerations as a basis for concluding that the District had demonstrated a "significant change in circumstances." The question is whether the record supports the district court's finding that these factors contributed to the significant changed circumstances. We will consider each factor in turn.

### 1. *Demographic Changes*

As explained *supra*, the district court concluded that "[t]he goals of the 1991 Consent Order have . . . been hindered by the changing demographics." *Mays*, 2015 WL 4528935, at *5. Specifically, the district court found that the data reflected "a consistent downturn in population [in the City of Wilmot] since the Consent Order was entered in 1991." *Id*. The court found no "evidence to indicate that this trend will not continue." *Id*.

On appeal, the plaintiffs admit that "[the City of] Wilmot has been losing population over the decades." But they assert that the population decline is not significant because the District "knew in 1991 that [the City of] Wilmot . . . was losing residents." The plaintiffs argue that because the parties could anticipate further population decline at the time that the district court entered the Consent Order, the present population decline does not constitute a changed circumstance.

-12-

"Ordinarily, . . . modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385 (citations omitted). A party who "anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree" must "satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.* (holding that remand to district court was required to consider whether upsurge in inmate population at county jail was foreseen by county officials, so as to preclude modification of consent decree requiring single celling of pretrial detainees).

In support of their argument that the District anticipated the population decline in the City of Wilmot, the plaintiffs cite the testimony of Carlton Lawrence, the District's financial officer. Lawrence previously served as Wilmot's superintendent during the 1984–1985 school year. After the District annexed Wilmot during the 1985–1986 school year, he served as the principal of the junior high school in Hamburg. From 2002 to 2006, he served as the superintendent of the District. Lawrence testified that "[t]he population decline has been a plague . . . on the Delta [,of which Wilmot is a part,] . . . [for] the last 40 years, from the change in the agriculture." Lawrence explained that this change and population decline "has affected school districts and schools up and down the Delta area" and described it as "an ongoing situation."

Lawrence's testimony shows that the District knew that a population decline was generally occurring in the Delta at the time of the 1991 Consent Order. Additionally, census data that the District admitted into evidence shows a 14.7-percent decline in the City of Wilmot's population from 1980 to 1990—the year before entry of the Consent Order. Consequently, the District could have anticipated further population decline in the City of Wilmot at the time that the Consent Order was entered. On the other hand, the rate of decline was not readily predictable from the

census data. The rate of decline is reflected in the District's Exhibit 26,[5] which reveals the following:

| City of Wilmot's Population | | |
|---|---|---|
| *Year* | *Total Population* | *Rate of Decline* |
| 1980 | 1,227 | |
| 1990 | 1,047 | 14.7% decline from 1980 |
| 2000 | 786 | 24.9% decline from 1990 |
| 2010 | 550 | 30% decline from 2000 |
| 2013 (estimated total population for 7/1/2013) | 531 | 32.4% decline from 2000 |

As the chart demonstrates, the 14.7-percent decline that occurred between 1980 and 1990 increased to a 24.9-percent decline between 1990 and 2000. The rate of decline jumped to 30 percent between 2000 and 2010. As a result, we conclude that the doubling of the rate of population decline in the City of Wilmot could constitute a significant change in circumstances that the District could not have anticipated at the time that the Consent Order was entered.

### 2. *Decrease in Enrollment*

The district court found that "Wilmot's enrollment numbers have dropped drastically since the Consent Order was entered." *Mays*, 2015 WL 4528935, at *6.

---

[5]Exhibit 26 consists of three charts from the U.S. Bureau of the Census: (1) "Total Population for Arkansas Places by County: Vintage 2013"; (2) "Population By Race and Hispanic or Latino (of any race); Arkansas By Place: 2010"; and (3) "Population by City 1980–2000." (All caps omitted.) We have condensed this information into one chart to show the population decline in the City of Wilmot.

As with the population decline, the plaintiffs admit "that the student population at Wilmot Elementary School has declined to the point where it had forty-nine total students in 2014–2015." But they argue that because the District "knew in 1991 that Wilmot proper was losing residents, [then] . . . it also knew that the school would lose students[,] too."

The testimony of Superintendent Max Dyson and supporting exhibits[6] reveal the following:

| Wilmot's Enrollment | |
|---|---|
| Year | Number of Students |
| 2009–2010 | 102 |
| 2010–2011 | 87 |
| 2011–2012 | 81 |
| 2012–2013 | 59 or 60 |
| 2013–2014 | 42 or 45 |
| 2014–2015 | 49 |
| January 15, 2015 | 48 (6–K, 12–1st, 7–2nd, 7–3d, 10–4th, 6–5th) |

While the record lacks data showing Wilmot's student enrollment at the time of the Consent Order, the aforementioned data shows an approximately 53 percent decline in student enrollment from the 2009–2010 school year to the 2014–2015

[6]We have combined the data from the following exhibits to show the number of students attending Wilmot during the designated years: (1) District's Exhibit 15 ("Wilmot Elementary"); (2) District's Exhibit 24 ("Headcount Statistics Report"); and (3) District's Exhibit 48 ("Wilmot Elementary School: Achievement History and Projected Outcome").

school year. This tracks the acceleration in the population decline for the City of Wilmot. Like the population decline, we conclude that the District could not have anticipated the rapid rate of decline in student enrollment at the time that the Consent Order was entered; therefore, this factor contributes to the significant change in circumstances.

### 3. *Fiscal Considerations*

The district court also found that "Wilmot's yearly deficits are not sustainable" based on District's Exhibits 15, 16, and 21, and Superintendent Dyson's testimony. *Mays*, 2015 WL 4528935, at *5. The court found that "[f]or the 2014–2015 school year, with three combined classes of grades K–1, 2–3, and 4–5, Wilmot operated at a deficit of $126,588.23." *Id.* (footnote omitted) (citing District's Exhibit 16).

The plaintiffs admit that "[a]t first blush" the district court's finding that Wilmot could not sustain running a deficit of $126,588.23 "seem[s] reasonable." Nonetheless, they argue that the District's annual budget is $16 million, with a routine surplus of $2 million. From this data, the plaintiffs conclude that the District is a "fiscally sound school district." They further argue that "[t]he [District] knew in 1991 that it would cost more to keep Wilmot open than to close it. Yet it agreed to keep Wilmot open nevertheless."

Superintendent Dyson testified about Wilmot's fiscal condition. In 2014–2015, the student funding matrix set forth in the Arkansas Code Annotated was $6,521.00 per student in taxpayer funding. Ark. Code Ann. § 6-20-2305(a)(2)(B) (2013 Repl.). The District's Exhibit 22 shows that Wilmot operated with a $13,254.05 cost per student in 2015. Superintendent Dyson testified that, as a result, each student at the Wilmot Campus *cost* the District $6,733.05 over the $6,521.00 in funding from the matrix. Based on these figures, Dyson testified that Wilmot's yearly deficits are not sustainable:

-16-

It doesn't matter what group you are in, what business, what organization, you cannot sustain deficit spending. Deficit spending will get you to the point of where you cannot operate. In school business deficit spending that will get you to the point to where you cannot operate within a period of years triggers what is called fiscal distress as such and you lose your local control.

District Financial Officer Lawrence similarly testified:

Well, the bottom line is that there simply is not enough student funding at—foundation funding, as the State called it, at Wilmot based on the number of students to support a full faculty and full services for the, for the student population there.

Lawrence also discussed Defendants' Exhibit 22 showing Wilmot's expenditure of $13,254.05 per student versus the much smaller expenditures per student in other District schools, stating, "Well, it just further demonstrates that the . . . per-student cost of operating an extremely small situation is a lot higher than the one that has higher numbers of students."

This testimony does not establish that Wilmot's expenses have or necessarily will produce a financial crisis because the District as a whole still operates at a significant surplus. Instead, it shows that the elimination of Wilmot would result in a "cost savings." *See Smith*, 769 F.3d at 573. The District would save almost $7,000 per student by eliminating Wilmot, but this savings alone is not a sufficient justification for modification of the consent decree. In the absence of population and enrollment decline, *see supra*, and educational considerations, *see infra*, the District's financial concerns would not establish the required significant change in circumstances.

### 4. *Educational Considerations*

Lastly, the district court found that educational considerations contributed to the significant change in circumstances warranting a modification of the Consent Order. On appeal, the plaintiffs challenge this finding, arguing that "Wilmot is the highest performing elementary school in the [District], which means that closing the school is not based on legitimate reasons of educational benefit."

The district court did address the Wilmot students' academic performance. *See Smith*, 769 F.3d at 573. It recognized that "the Wilmot students are currently testing at or near the same levels as students at Noble/Allbritton Elementary and Portland Elementary." *Mays*, 2015 WL 4528935, at *5.[7] After recognizing the quality performance of the Wilmot students, the district court further explained why additional educational considerations undermined the students educational experience. First, the court found that "[t]here are indications that the combined grades classroom configuration has put a strain on the teachers who are faced with teaching a full curriculum to two different grades every day." *Id*. at *6. District Exhibit 14 supports this finding. It reflects Board minutes in which a teacher, on behalf of the Wilmot teachers, told the Board that "there is not enough time in the day to teach both grades."

Second, the court credited the District's "concern that the Wilmot students in these extremely small classroom environments are not being sufficiently challenged in terms of classroom competition and are not being exposed to other cultural viewpoints that might exist in a larger classroom setting." *Id.* at *5. The plaintiffs assert that because the District produced no evidence that "larger class sizes would

---

[7]The District offered the testimony of Lisa Atkins, the Wilmot Elementary District School Improvement Specialist, who explained that Wilmot is a "needs improvement focus school" because it tested fewer than 25 students. Atkins testified that "last year there were 18 students tested at Wilmot grades three through five. So there was not a minimum end of 25 students. So the school falls into a focus status."

benefit Wilmot's students," the district court erroneously accepted the District's "counterintuitive and evidence-free argument that Wilmot's student teacher ratio was so small as to be detrimental." But Superintendent Dyson explained that his opinion about placing the Wilmot students in larger classrooms derived from Ted Sizer's "Horace's Compromise," which is the theory of the "student as learner, and teacher as coach where students are put in learning centers and teachers . . . involve[] them in project based learning." According to Dyson, "that's where [he] made [his] decision that five students in a classroom, the same five all year, no matter how well they are performing" are still being held back by the lack of opportunities.[8] Furthermore, the district court credited the District's concern that "due to the isolated setting of the campus, Wilmot students do not currently have the opportunity to participate in after-school tutoring, remediation, and other programs that are available at other campuses." *Mays*, 2015 WL 4528935, at *5. The plaintiffs have offered no evidence or argument to counter proof that the Wilmot students would receive these additional educational resources if transferred to another campus.

Third, the court found that "[a]s to the GT program at Wilmot, each year for the past several years, a handful of students have declined to participate in the program despite having been accepted." *Id.* at *6. The plaintiffs have not challenged the court's factual finding that "twelve students did not turn in forms that would have given the school district permission to test them for entry into the GT program [for the 2010–2011 school year]." *Id.* But they do challenge the court's conclusion that transportation challenges for GT students contributed to the lack of participation in the GT program. They argue that the District never produced evidence that the commute dissuaded eligible students from participating in the GT program. The

---

[8]The District's desire for larger class sizes with greater diversity and interaction is legitimate but it is certainly not the only successful educational model nor indisputably efficacious for all students. Were the standard of review more rigorous than abuse of discretion this consideration by the District would not be given much weight in determining changed circumstances.

court's conclusion, however, is based on the testimony of District GT Coordinator Oliver and GT Specialist Renee Treadwell. When asked to explain "some of the benefits that would flow from moving the GT program as it now is conducted at the Wilmot campus to the Portland and the Hamburg campuses," Oliver responded:

> The GT program would be housed at the home campus of the students, therefore that would reduce the time out of their classroom instruction and *allow them to have the two hours to be in the classroom*. It would also permit them *not to miss activities that they might miss due to the bus ride*.

(Emphases added.) Additionally, Treadwell testified that, in her expert opinion, the District's GT pull-out program at Wilmot was not the "best practice[]." She explained that "the added time that [the students are] out of their regular classrooms for the travel [to Wilmot] . . . adds a burden to those students." According to Treadwell:

> [I]f those students who are [at] Wilmot now were to go to either Hamburg or to Portland when they're identified as needing the GT services, they would only be out of their regular classroom for the 150 minutes as a pullout program. And there would not be the additional missing of that classroom instruction.

In finding that the decline in participation in the GT pull-out program at Wilmot is a factor indicating a significant change in circumstances warranting modification of the consent order, the district court expressly rejected the plaintiffs' argument that the now-existing "pull-out" GT program (instituted in 1991) "has always been in violation of the [1991] Consent Order." *Mays*, 2015 WL 4528935, at *4 n.5. Specifically, the plaintiffs had argued that the Consent Order mandated that "GT students from all over the district were supposed to attend school full time at Wilmot." *Id*. The district court disagreed. First, it pointed out that "the elementary GT program in the . . . District has historically operated as a pull-out program, even before the GT program was centralized at Wilmot." *Id*. Second, the court found that "the Consent

Order was unequivocal in its requirement that students attend school in the attendance zone where their parents reside." *Id.* Finally, the court noted that "the GT program at Wilmot was operated as a pull-out program from 1991–2014 without any indication from Plaintiffs that they were dissatisfied with the program or that it was in violation of the Consent Order." *Id.*

The district court's analysis is sound. "After 23 years of silence on the subject," *see id.*, the plaintiffs argument now that the low participation in the GT pull-out program at Wilmot resulted from the District's operation of the program in violation of the Consent Order lacks support in the record.

In summary, we conclude that educational considerations, while not particularly strong, do provide additional support for the district court's finding of a significant change in circumstances.

B. *Modification Suitably Tailored to Changed Circumstances*

Having concluded that the district court committed no reversible error in finding a significant change in circumstances, we now address "[t]he second *Rufo* element—whether the modification is suitably tailored to the changed circumstances." *Smith*, 769 F.3d at 573. "Under *Rufo*, a court of equity's flexible authority to modify a consent decree on account of changed circumstances includes the authority to relieve the moving party of a consensual commitment that was essential to the original decree." *Id.* As a result, the district court may "order a changed-circumstances modification that effectively terminates the decree." *Id.*

Here, the district court approved closure of Wilmot and modification of the GT program as the proper modification of the Consent Order due to the significant changed circumstances. We conclude that such modification is suitably tailored. The Consent Order began as an effort to ensure "that the educational experience in the [District] occur on a desegregated basis." *Mays*, 2015 WL 4528935, at *6. The

modifications sought by the school district in light of the (1) demographic changes, (2) decrease in enrollment, (3) cost savings, and (4) educational considerations are in line with the initial Consent Order.

Because we conclude that both *Rufo* factors are satisfied, we hold that the district court did not abuse its discretion in granting the District's motion to approve closure of Wilmot and to modify the GT requirements.[9]

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

[9]In reaching this holding, we, like the district court, recognize "that Wilmot Elementary is an important part of the [C]ity of Wilmot, and that the [C]ity will feel a great loss with its closure." *Id*. at \*6.

-22-