# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-1340

_____

United States of America

*Plaintiff - Appellee*

v.

Junction City School District; R.L. Bolen, Superintendent of the Junction City
School District No. 75; Junction City School Board

*Defendants - Appellees*

v.

Arkansas Department of Education; Arkansas State Board of Education

*Intervenors - Appellants*

------------------------------

Brittany Harrison; Katelyn Williams; Lance Harrison; Chase Williams; Chasity
Klutts; Sarah McCoy; Cole McCoy

*Amici on Behalf of Appellant(s)*

_____

No. 19-1342

_____

Rosie L. Davis

*Plaintiff - Appellee*

v.

William Dale Franks

*Defendant - Appellee*

v.

Arkansas Department of Education; Arkansas State Board of Education

*Intervenors - Appellants*

_____

No. 19-1348

_____

Mary Turner, Individually and as next friend of Torrance Turner, a minor; Lucy Cheatham, Individually and as next friend of Andrew Cheatham, a minor; Mary Rose, Individually and as next friend of Victor Rose; Obie Sasser, Individually and as next friend of Frank Sasser, a minor; Barbara Dudley, Individually and as next friend of Kerri Dudley, a minor; Ida Dudley, Individually and as next friend of Tia Dudley; Rosie Blair, Individually and as next friend of Kimberly Blair, a minor; Johnny Blair, Individually and as next friend of Kimberly Blair, a minor; Robert Wise, Individually and as next friend of Valarie Wise, a minor; Mildred Thompson, Individually and as next friend of Kelona Thompson, a minor

*Plaintiffs - Appellees*

v.

Lafayette County School District

*Defendant - Appellee*

-2-

Larry Hudson, Individually and in his official capacity as Superintendent of Schools for the Lewisville School District No. 1, A Public Body Corporate; Hollis Sasser, Individually and in his official capacity as President of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Harry Smith, Individually and in his official capacity as member of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Leslie Nutt, Individually and in his official capacity as member of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Steve Groves, Individually and as member of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Carolyn Moss, Individually and as member of the Board of Education of the Lewisville School District No. 1, A Body Corporate; Johnny Ross, Individually and as member of the Board of Education of the Lewisville School District No. 1, A Body Corporate

*Defendant*s

v.

Arkansas Department of Education; Arkansas State Board of Education

*Intervenors - Appellants*

_____

No. 19-1349

_____

Larry Milton, on behalf of Himself and Infants Shanna Milton and Shana Milton, by next friend Shanna Milton, by next friend Shana Milton; Willie D. Harris, Dr.; on Behalf of Himself and Infant Mark Neil, by next friend Mark Neil; Bobbie Ray Cheeks, on Behalf of Infant Bobbie Ray, Jr., by next friend Bobbie Ray, Jr.

*Plaintiffs - Appellees*

Lee Nayles, Dr.; on Behalf of Himself and Infant Jon Nayles, by next friend Jon Nayles

*Plaintiff*

Terry Alexander

*Plaintiff - Appellee*

v.

Bill Clinton, Governor of the St. of AR; Individually

*Defendant*

Arkansas State Board of Education; Arkansas State Board of Education,

*Defendants - Appellants*

Jeff Starling, Member, Arkansas State Board of Education; Earle Love, Member, Arkansas State Board of Education; Robert L. Newton, Member, Arkansas State Board of Education; L. D. Harris, Member, Arkansas State Board of Education; Harry P. McDonald, Member, Arkansas State Board of Education; Alice L. Preston, Member, Arkansas State Board of Education; Elaine Scott, Member, Arkansas State Board of Education; Walter Turnbow, Member, Arkansas State Board of Education; Nancy Wood, Member, Arkansas State Board of Education; Camden, AR School District No. 35, The Board of Education of the, A Public Body Corporate; Camden, AR Housing Authority, The Board of Directors of the, A Public Body Corporate; Camden, AR, City of, A Public Body Corporate; Harmony Grove, AR School District, The Board of Education of the, A Public Body Corporate; Burton Burton, Director, Arkansas Department of Education

*Defendant*s

v.

Camden, AR Fairview School District, A Public Body Corporate

*Defendant - Appellee*
_____

-4-

Appeals from United States District Court
for the Western District of Arkansas - El Dorado

_____

Submitted: December 11, 2019
Filed: December 31, 2020

_____

Before ERICKSON, MELLOY, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Camden-Fairview School District, Hope School District No. 1A, Junction City School District, and Lafayette County School District ("the Districts") sought modification of existing desegregation consent decrees to allow their exemption from Arkansas's Public School Choice Act. Ark. Code. Ann. § 6–18–1906 (2017). The district court[1] granted the Districts' motions and modified the consent decrees to explicitly limit the transfer of students between school districts. The Arkansas Department of Education appealed, alleging that the modification imposed an impermissible interdistrict remedy. We have jurisdiction under 28 U.S.C. § 1291. Because there was a substantial change in Arkansas law after the consent decrees were enacted and the district court's modification was not an impermissible interdistrict remedy, we affirm.

_____

[1]The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas.

## I. Background

### A. Consent Decrees

A 1960's court order required Junction City School District ("Junction City") to consolidate and integrate, but compliance with the order was halting and half-hearted and the school remained effectively segregated for years. In response to the situation, the United States Department of Justice and Junction City entered a 1970 intradistrict consent decree requiring the reassignment of students on a non-racial and non-discriminatory basis. The 1970 consent decree remains in effect. Under its terms, Junction City is enjoined from maintaining segregated student assignments, homerooms, activities, or bussing.

Hope School District No. 1A ("Hope") entered an intradistrict consent decree in 1990 to "remedy any past discrimination based upon race" and "prevent any like discrimination from occurring in the future." The consent decree enjoins Hope from "engaging in any policies, practices, customs or usages of racial discrimination" in any school operations. Hope must "maintain a unitary, racially nondiscriminatory school system wherein all schools are effectively and equitably desegregated and integrated."

In 1993, Lewisville School District entered into an intradistrict consent decree that now binds Lafayette County School District ("Lafayette County"). The consent decree prohibits Lafayette County "from allowing a racially discriminatory environment to exist within the school district" and requires the district to "maintain a unitary, racially non-discriminatory school system wherein all schools are effectively and equitably desegregated and integrated." Lafayette County must also maintain a desegregation and integration policy that "promotes pupil and staff integration rather than . . . passive acceptance of desegregation between students of all races."

Camden-Fairview School District ("Camden-Fairview") is bound by a 1990 interdistrict consent decree entered into by the Fairview School District ("Fairview") and the Harmony Grove School District ("Harmony Grove"). Paragraph 1(C) of the 1990 decree requires Harmony Grove to maintain an open admission policy for non-resident black students and forbids the transfer of white students from Fairview without Fairview's written permission. Both school districts must "refrain from adopting student assignment plans or programs that have an interdistrict segregative effect on either district" and "work cooperatively to create interdistrict polices and programs to end the ravages of segregation." In 2001, Camden-Fairview and Harmony Grove moved the district court to grant unitary status but stated that the provisions of paragraph 1(C) "shall remain in full force and effect to prevent future 'white flight.'" The court granted the districts unitary status in 2002 but maintained paragraph 1(C)'s restrictions. In 2010, the court found paragraph 1(C) still applicable.

The district court retained jurisdiction over all four cases to ensure "compliance with the spirit and terms of" the decrees and to enforce its orders.

*B. Changes in the Law*

In 1989, Arkansas adopted the Arkansas School Choice Act of 1989 ("1989 Act"), which allowed children to apply to attend a nonresident school district. See Ark. Code Ann. § 6–18–206 (repealed in 2013). The 1989 Act limited a student's ability to "transfer to a nonresident district where the percentage of enrollment for the student's race exceeds that percentage in his resident district." Id. The law remained in effect until 2013, when it was expressly repealed by the Arkansas Public School Choice Act of 2013 ("2013 Act"). Ark. Code. Ann. § 6–18–1906 (2013). The 2013 Act allowed for students to transfer to nonresident school districts but did not bar segregative transfers. Instead, the 2013 Act allowed school districts to declare

themselves exempt if participating in school choice would conflict with an existing federal-court desegregation plan or order.

Two years later, Arkansas enacted the Public School Choice Act of 2015 ("2015 Act"), which eliminated a school district's ability to declare itself exempt from participating in school choice. Ark. Code. Ann. § 6–18–1906 (2015). Under the 2015 Act, a district seeking an exemption was required to submit proof of an active desegregation order or plan to the Arkansas Department of Education ("the Department"). If a district submitted proof, the terms of the order or plan would govern. In 2017, Arkansas amended the 2015 Act ("2017 Amendments") to require districts seeking exemptions to submit proof of a desegregation plan or order "that explicitly limits the transfer of students between school districts." Ark. Code. Ann. § 6–18–1906 (2017).

### C. Current Litigation

Junction City, Hope, and Camden-Fairview applied for exemptions from school choice each year from 2013 to 2017. Lafayette County took part in school choice for the 2013-2014 school year but, after losing thirty non-black students to interdistrict transfers, applied for an exemption due to segregative impact. All of the Districts received exemptions from 2014 to 2017. The Districts applied for exemptions for the 2018-2019 school year but were denied. As a result, they were required to participate in school choice. The Districts filed motions for declaratory judgment, clarification of previous orders, or modification of previous orders. They argued that participating in school choice would have a segregative impact and cause them to violate existing desegregation orders.

After a hearing, the district court granted the Districts' motions to modify the consent decrees to prohibit segregative, interdistrict transfers. While Camden-Fairview had been declared unitary, the court determined that the remaining

-8-

desegregation obligations of paragraph 1(C) allowed modification. The court found that the repeal of the 1989 Act and the enactment of the 2017 Amendments were a significant change in law. Based on their language and the context surrounding the decrees' adoption, the court determined that the decrees were intended to prohibit any racial discrimination within the Districts. The court modified the consent decrees to "explicitly prohibit the segregative inter-district transfer of students from [the Districts] to other school districts, unless such a transfer is requested for education or compassionate purposes and is approved by [the Districts'] school board[s] on a case-by-case basis." The Department appeals the district court's modification orders.

## II. Discussion

We review the district court's decision to modify a consent decree for abuse of discretion. Davis v. Hot Springs Sch. Dist., 833 F.3d 959, 963 (8th Cir. 2016). We will find an abuse of discretion only where a court's decision was based on erroneous legal conclusions or clearly erroneous factual findings. Parton v. White, 203 F.3d 552, 556 (8th Cir. 2000). Where possible, courts should interpret the parties' intent from the consent decree's unambiguous terms. Pure Country, Inc. v. Sigma Chi Fraternity, 312 F.3d 952, 958 (8th Cir. 2002). However, the circumstances and context surrounding the order cannot be ignored. United States v. Knote, 29 F.3d 1297, 1300 (8th Cir. 1994); see also Mays v. Bd. of Educ. of Hamburg Sch. Dist., 834 F.3d 910, 918 (8th Cir. 2016). "This is because a consent decree is a peculiar sort of legal instrument that cannot be read in a vacuum. It is a kind of private law, agreed to by the parties and given shape over time through interpretation by the court that entered it." Knote, 29 F.3d at 1300 (cleaned up). We give a large measure of deference to the interpretation of the district court that entered the consent decree. Id.

*A. Substantive Change in Law*

The Department alleges that the district court erred in modifying the underlying consent decrees. The Department argues that, because the original decrees do not discuss interdistrict transfers, the repeal of the 1989 Act and enactment of the 2017 Amendments are not a substantial change in circumstances supporting modification.

Consent decrees may be modified under Federal Rule of Civil Procedure 60(b). Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist., 769 F.3d 566, 570 (8th Cir. 2014). Modifying a consent decree may be necessary where the laws or facts at issue at the time of issuance have changed or new ones have arisen. Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 437 (1976); Davis, 833 F.3d at 963–64. "Modification may be appropriate when changed factual conditions make compliance with the decree substantially more onerous, a decree proves to be unworkable because of unforeseen obstacles, or enforcement of the decree without modification would be detrimental to the public interest." Parton, 203 F.3d at 555.

The party seeking modification must establish a significant change in circumstances warranting revision of the decree. Smith, 769 F.3d at 570–71. If the moving party shows a significant change in circumstances, the court then considers if the proposed modification "is suitably tailored to the changed circumstances." Id. at 571. Modification should not be granted where a party relies on events that were anticipated when the decree was entered. Mays, 834 F.3d at 919. The movant must show that the change in law actually affects the section of the consent decree at issue. Davis, 833 F.3d at 964.

The district court found that the repeal of the 1989 Act and the subsequent enactment of the 2017 Amendments were a significant change in law that allowed for modification of the consent decrees. The court examined the underlying orders and determined that the consent decrees "clearly intended to prohibit *any* racial

discrimination occurring within" the Districts, "including preventing student transfers which result in segregation of [the Districts'] student body." The court specifically found that the original consent decrees did not explicitly bar interdistrict transfers because the 1989 Act already prohibited transfers where there was a segregative impact or, in the case of Junction City, such transfers were not allowed in Arkansas when the decrees were entered. The court determined that the 2017 Amendments' requirement that a court order explicitly bar interdistrict transfers presented an unforeseen obstacle making the consent decrees unworkable.

We agree that the laws influencing the consent decrees have clearly changed since the Districts entered into the agreements. Had Arkansas law not prohibited interdistrict transfers when the decrees were enacted, it is likely that the Department of Justice would have required that language similar to the district court's modification be included in the agreements. A plain reading of the consent decrees shows that they were intended to prohibit all forms of racial segregation. It was reasonable for the authors of the decrees to rely on existing laws to frame the agreements and not include provisions for actions already prohibited by those laws. See Knote 29 F.3d at 1300 (stating that we cannot ignore the context in which a consent agreement was entered).

In crafting its modification order the district court also took notice of segregative issues stemming from the State's inaction in the face of white flight. The court heard evidence about the interdistrict transfers' effect on the Districts, including Lafayette County's loss of thirty non-black students in the only year it did not receive an exemption from participating in school choice. In Edgerson on Behalf of Edgerson v. Clinton, we stated that district courts are "uniquely situated to appraise the societal forces at work in the communities where they sit." 86 F.3d 833, 838 (8th Cir. 1996) (cleaned up). These appraisals include determining whether transfer policies caused white flight. See id. While the court in Edgerson did not find that the transfer policies had caused white flight, id. at 837, segregative interdistrict

-11-

transfers in this case had already negatively affected the Districts. It was not improper for the district court to consider these facts in its determination.

The dissent seeks to minimize the evidence of white flight that was before the district court. Aside from one district (Junction City), which had only private school students requesting interdistrict transfers, the Department put forth limited evidence regarding private school students requesting transfers. In particular, the Department pointed only to two other private school families making such requests, both located in Camden-Fairview. The Department did not present evidence regarding the number of transfer requests by private school students in either Hope or Lafayette County.

The evidence in the record is contrary to the dissent's assertions that there are "no facts" to support a finding of a white flight problem in Junction City and that interdistrict transfers would have little to no impact on Camden-Fairview's and Hope's racial demographics. Multiple superintendents with decades of experience in southern Arkansas schools testified that white flight would be a problem in Junction City. As to the other Districts, all fifteen students requesting interdistrict transfers in Camden-Fairview were from non-black students. The former superintendent of Camden-Fairview (the superintendent when the district was declared unitary) testified that the 1989 Act's interdistrict transfer prohibition was "critical" to the district achieving unitary status.

Of the 70 interdistrict transfer requests from students in Hope, 68 of them were from non-black students. Hope's superintendent testified that the percentage of non-black students making interdistrict transfer requests did not surprise him because he had discussions with white parents as to the reasoning why the parents wanted to move their children to a different school district. The reasons included, in part, because there was nobody in the child's grade to date; there was nobody to invite for sleepovers; and a disagreement with the morals of the student body. The dissent incorrectly focuses on the fact that only 23 students actually transferred from Hope.

-12-

The lower transfer rate was because the other students' requests were denied by the receiving school districts. But for the actions of other school districts denying applications, Hope could have lost 3% of its non-black student body, the maximum allowed under Arkansas law, in its very first year of school choice participation.

Both school years Lafayette County participated in school choice, Lafayette County lost the maximum 3% of its non-black student body allowed under the law, or very close to it. During the 2013-2014 school year, it lost over 30 of its students to interdistrict transfers. Each one of the transferring students was white. During the 2018-2019 school year, after its application for an exemption from school choice was denied, 35 students requested interdistrict transfers. Once again, each one of the transferring students was white. All but one of the students was accepted by other school districts.

The district court did not abuse its discretion in considering and crediting evidence of white flight when it determined that a substantial change in circumstances had occurred warranting modification of the consent decrees.

*B. Interdistrict Remedy*

The Department asserts that, even if the repeal of the 1989 Act and enactment of the 2017 Amendments qualify as a substantial change in the law, the district court's modification is still an impermissible interdistrict remedy. The Department essentially argues that because the modification prohibits the Districts from allowing their students to make segregative transfers, the court's modification binds other school districts. We reject this argument.

A court cannot order an interdistrict remedy without showing an interdistrict violation. Edgerson, 86 F.3d at 837 (citing Milliken v. Bradley, 418 U.S. 717, 745 (1974) (Milliken I)). A violation is interdistrict if it "caused segregation between

-13-

adjoining districts." Missouri v. Jenkins, 515 U.S. 70, 94 (1995). Interdistrict remedies occur when a district court restructures or coerces local governments or their subdivisions. Liddell v. Missouri, 731 F.2d 1294, 1308 (8th Cir. 1984) (citing Hills v. Gautreaux, 425 U.S. 284, 298 (1974)).

We have not found an interdistrict remedy where the district court's action does not threaten autonomy of a separate governmental body. In Liddell, the court required the State to pay the cost for voluntary interdistrict transfers. Id. We stated that requiring the State to bear the transfer costs "does not threaten the autonomy of local school districts; no district will be coerced or reorganized and all districts retain the rights and powers accorded them by state and federal laws." Id. Here, the district court's remedy does not threaten the autonomy of any school district. The modification's only potential effect on other school districts is a possible decrease in transfer requests from the Districts' students. Transfers out of the Districts may still occur, no matter the race of the student, as long as there is an educational or compassionate purpose and the request is approved by the student's school board. Limitations are placed only on the ability of a student to leave one of the Districts. These requirements do not limit or set boundaries on other school districts' rights or powers to accept transfer students into their districts once the students have been approved to transfer out of their original school. By restricting the conditions under which students can transfer out of the Districts the district court has placed limitations on only the Districts, not on any other school district in the state of Arkansas. The district court has not restructured or coerced local governments, so the modification of the consent decrees does not impose an impermissible interdistrict remedy.

Based on our review of the record, and the large degree of deference we must give to the district court that entered the consent decree, we cannot find that the district court abused its discretion in modifying the consent decrees.

## III. Conclusion

For the reasons stated herein, we affirm.

KOBES, Circuit Judge, dissenting.

The four Districts and nominal plaintiffs say they need a federal court order exempting them from the 2017 Arkansas Public School Choice Act, which allows parents to send their children to schools in districts where they do not live, or they will be unable to comply with decades-old desegregation decrees. The decrees prevent the Districts from operating dual school systems and racially discriminating against students and faculty. With one limited exception, the four decrees do not prohibit students transferring to another district.

In my view, the district court abused its discretion by modifying the decrees. The overwhelming evidence shows that the decrees prevent the Districts from using internal school operations to separate students based on race and treat them unequally. Because these internal policies are unrelated to student transfers, the Districts cannot point to a "section of the consent decree" "that the change in the law has an actual effect on." Davis v. Hot Springs Sch. Dist., 833 F.3d 959, 964 (8th Cir. 2016). In fact, each school superintendent testified that they could comply with the Act and offer a nondiscriminatory school environment. Hr'g Tr. 146:23–147:6 (Junction City); 176:1–6 (Lafayette); 42:5–12 (Camden-Fairview); 123:7–10, 124:1–9 (Hope).

The district court and the majority assume that the decrees sought to maintain racial balance within each District and that interdistrict transfers jeopardize that balance. The facts do not support either assumption. Testimony showed that school choice transfers would not affect the Districts' racial balance because the transferring students were enrolled in private schools. E.g., Hr'g Tr. 145:4–7 ("Our demographics

-15-

did not change."). If the majority's assumptions were correct, then two District superintendents would not have agreed that they could "comply with th[e] order, [] even if [they] lose [] students to School Choice." Hr'g Tr. 124:7–9, 146:23–147:6.

Instead of granting relief from the decrees, what really happened was the district court used its equitable power to grant relief from otherwise valid Arkansas law. This exceeded its remedial authority in two ways. First, a district court may not invoke its "equitable power to fashion a remedy to correct a condition unless it currently offends the Constitution." Jenkins v. Missouri, 807 F.2d 657, 666 (8th Cir. 1986) (en banc) (citation omitted). The district court declined to identify a constitutional violation caused by the change to Arkansas law. Second, the remedy itself violates the Constitution because it requires the Districts to deny transfers solely on the basis of race without a compelling interest. See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701 (2007). The Districts did not advance a compelling interest. They have not and cannot show the orders continue to remedy past effects of segregation, and the record does not support that school choice transfers are a substantial cause of segregation.

## I.

The district court found that the new requirement under the Act was a significant change in circumstances because requiring the desegregation decrees to "explicitly bar inter [] district transfers present[ed] an unforeseen obstacle that cause[d] the [decrees] to be unworkable." Add. 12. The decrees have nothing to do with interdistrict transfers or maintaining the racial balance of each District, though, so there are no grounds that warrant modification. Plus, the Districts can comply with the Act and operate integrated schools in a non-discriminatory manner.

## A.

The first step is to determine what problems the decrees address and what they require of the Districts. The overwhelming evidence shows that these decades-old

-16-

decrees prevented racial discrimination in *internal* school operations and ended segregated, dual-school systems *within* the Districts. That is the *de jure* segregation that the decrees sought to remedy. The majority finds that the decrees implicitly require the Districts to preserve their racial demographics. I respectfully disagree.

In Junction City's 1970 decree, the district court found that, despite an earlier desegregation plan, "many of the homerooms and classes in the high school remain[ed] all-black and all-white," Add. 74, and that "the black students [in the elementary school] [we]re segregated by classroom and taught by black instructors," id. Junction City had also not taken any steps to desegregate its school bus routes, so the district court "grant[ed] that part of the plaintiff's motion concerning desegregation of classroom facilities" and the part "concerning [bus] transportation of students." Add. 75.

In the late 1980s, Hope and Lafayette teachers and parents sought an end to racially discriminatory practices against staff and students. The decrees prohibit the Districts from "engaging in any policies, practices, customs or usages of racial discrimination in any of its school operations including, but not limited to, faculty assignments, student assignments, and the treatment of black and other minority pupils within the school system." Add. 79; see also Add. 91. Among other school operations, the decrees require use of "objective, nondiscriminatory, job-related" criteria in all employment matters, Add. 80, 91, "discipline policies which do not adversely and disparately impact" black students, Add. 85, 94, and "[a]ll classes, programs and/or activities of the district shall be desegregated and integrated in fact," see Add. 84, 94.

In Camden-Fairview, parents brought suit to end racially discriminatory practices within three school districts (Camden, Fairview, and Harmony Grove), the City of Camden, and the Housing Authority of Camden. In the 1991 order, the court required Harmony Grove and the soon-to-exist Camden-Fairview to "refrain from adopting student assignment plans or programs that have an interdistrict segregative effect" in their districts. Add. 99. In the December 2001 order, the district court

recognized that the principal "desegregation issues were resolved by consolidation of" the dual districts into "the Camden Fairview School District." Add. 103. This resulted in "student assignments without racially identifiable schools and affirmatively avoids intra-school desegregation." Add. 103. This order, and the one declaring Camden-Fairview unitary, still prohibited white students in Camden-Fairview from transferring to Harmony Grove.

The district court properly found that the Junction City, Hope, and Lafayette decrees "contain[] no language expressly prohibiting inter [] district student transfers." Add. 11. The text and history of all four decrees show that the principal issue was not white students migrating out of the Districts. Instead, they addressed a different and more pervasive problem: using race in internal school operations to keep the students and staff apart (separate schools, classrooms, and activities) and to keep them unequal (using different diplomas, discipline, and criteria for staff assignments, pay, and advancement). The majority states that the decrees are silent on interdistrict transfers because the parties relied on the existing statutory framework that prohibited them. But the Camden-Fairview decree demonstrates that if white students transferring to a "whiter" school was an issue, desegregation decrees addressed that problem—even after the 1989 Act.

The majority also claims that a "plain reading of the consent decrees shows that they were intended to prohibit all forms of racial segregation," Maj. Op. 11, and then assumes that one student transferring to a district that has a student body with a greater percentage of that student's race is segregation.[2] This implicitly finds that the decrees require the Districts to preserve their racial demographics. But the Supreme Court has explained that "[r]acial balance is not to be achieved for its own sake," and should only "be pursued when racial imbalance has been caused by a constitutional

_____

[2]The majority also speculates about what the Department of Justice would have done had Arkansas law allowed interdistrict transfers. Maj. Op. 11. Notably, the Department of Justice only brought the Junction City action. Even had it been involved with the other actions, it is more likely that if multi-district segregation had been an issue the decrees would have said so.

-18-

violation." Freeman v. Pitts, 503 U.S. 467, 494 (1992). The decrees speak to many different kinds of racial segregation and discrimination, but racial imbalance between different districts is not one of them. Absent text in the decrees relating to such a violation and relief, the assumption that the decrees require the Districts to preserve their racial demographics is wrong.

B.

The Districts have failed to show that a "significant change in circumstances *warrant[ed]* revision of the decree." Mays v. Bd. of Educ. of Hamburg Sch. Dist., 834 F.3d 910, 918 (8th Cir. 2016) (emphasis added). The Supreme Court identified five grounds that may warrant revision of a decree: (1) when changed factual conditions make compliance with the decree substantially more onerous, (2) when the decree proves to be unworkable because of unforeseen obstacles, (3) when enforcement of the decree without modification would be detrimental to the public interest, (4) if one or more of the obligations placed upon the parties has become impermissible under federal law, and (5) when the statutory or decisional law has changed to make legal what the decree was designed to prevent. Rufo v. Inmates of Suffolk Cty. Jail, 502 U.S. 367, 388 (1992). The Districts only assert the second and fifth grounds.[3] Ultimately, they must point to a "section of the consent decree" "that the change in the law has an actual effect on." Davis, 833 F.3d at 964 (8th Cir. 2016).

The Districts cannot show that the decrees are unworkable due to changes in Arkansas law. In Rufo, the Supreme Court gave two examples of unworkable decrees. The first was New York State Ass'n for Retarded Children Inc. v. Carey, 706 F.2d 956, 971 (2d Cir. 1983), where a provision to rehouse thousands of patients in "15 bed/10 bed" communities was logistically impossible to achieve with the decree's overall goal to empty unsanitary institutions as soon as possible. In the

---

[3]Although the Districts contend that the district court considered "changes in fact," they only press the change in Arkansas law. Dist. Br. 18. In other words, they claim that statutory law has changed and permits what the decrees sought to prevent.

second, Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1117 (3d Cir. 1979), the defendants were unable to meet the decree's requirement to perform 180,000 health screenings in a year because eligible recipients turned down the services, some recipients did not show up to the appointments, and not enough doctors participated. In both examples, the defendants wanted a specific requirement in the decree modified because they could not comply.

Here, the districts can comply with the decrees. The question is whether allowing student transfers between districts interferes with the Districts' obligations to operate integrated schools and provide a nondiscriminatory atmosphere to their students. I see no conflict; one does not affect the other. The district court implicitly recognized this because instead of holding that the original decrees prohibited interdistrict transfers, it modified the decrees to include that express prohibition. The decrees are unambiguous: they prevent the Districts from using race to discriminate in operating their schools. Each superintendent testified that the Act did not prevent them from offering a nondiscriminatory school environment to students. Hr'g Tr. 146:23–147:6 (Junction City); 176:1–6 (Lafayette); 42:5–12 (Camden-Fairview); 123:7–10, 124:1–9 (Hope). The Hope and Camden-Fairview superintendents explicitly agreed that they could "comply with th[e] order, [] even if [they] lose [] students to School Choice." Hr'g Tr. 124:7–9 (Hope); 42:10–12 (Camden-Fairview). There is simply no evidence to the contrary.

The district court erroneously concluded that because Arkansas law did not allow interdistrict transfers in 1970, in the case of Junction City, Arkansas's new requirement that a desegregation decree order "explicitly bar inter [] district transfers presents an unforeseen obstacle that causes the [District's] Order to be unworkable." Add. 12. I agree that interdistrict transfers may have been unforeseen in 1970, but the court never explains why it is an obstacle to a discrimination-free school district. It assumes that interdistrict transfers will upset Junction City's racial balance. No facts support this assumption. There is no history of white flight because Junction City had never before participated in school choice. And for the current school year, the five

-20-

students seeking transfers attended private—not public—schools, so Junction City's "demographics did not change." Hr'g Tr. 145:4–7.

The district court's conclusions about Hope, Lafayette, and Camden-Fairview are similarly flawed. The Camden-Fairview decree's express prohibition on interdistrict transfers to Harmony Grove shows that the original decrees could have, but did not, prohibit all interdistrict transfers. It defies the rules of ordinary contract interpretation to conclude otherwise. See United States v. Knote, 29 F.3d 1297, 1299 (8th Cir. 1994) (for consent decrees "we basically look to rules of contract interpretation."). The plaintiffs in the Hope and Lafayette actions had reason to know about the Camden-Fairview litigation because the three cases were brought around the same time and they shared the same attorney.[4]

The record also shows that interdistrict transfers would have little to no impact on Camden-Fairview and Hope's racial demographics.[5] Camden-Fairview's superintendent testified that only 15 students (out of 2,700) applied for a transfer. Like Junction City, some were not enrolled in public schools and could not change the racial demographics. Hr'g Tr. 50:5–51:9. Hope's superintendent stated that the total number of transfers accounted for 1.3% of the district's enrollment but, again, some of those transfers "were [currently] attending private schools." Hr'g Tr. 127:20–128:9. At bottom, only seven Hope students out of 2,447 transferred. Hr'g Tr. 133:4–14.

---

[4]This also reinforces the conclusion that the Hope and Lafayette decrees were not meant to address interdistrict segregative effects. Had that been an issue in the Hope and Lafayette districts, it seems likely counsel would have sued the third-party districts and included a similar provision in the decrees as he did in Camden-Fairview's decree.

[5]Lafayette claims it lost 30 non-black students in the one year it participated in school choice. It is undisputed that 30 school choice transfers exceed the statutory 3% cap for that year (21 students from 689 enrolled students). Ark. Dep't of Educ., Lafayette Cty. Sch. Dist. 2013-2014, https://bit.ly/2xhvOKY (last accessed Oct. 23, 2020). Even if 21 "non-black" students transferred, Lafayette still has not presented an "obstacle" to providing a nondiscriminatory education to its students.

Without citation, the majority claims that the district court "took notice of the segregative issues stemming from the State's inaction in the face of white flight." Maj. Op. 11. Yet, the district court never mentions white flight. The majority attempts to insulate its conclusion by pointing to Edgerson's direction that a district court's assessment of the "societal forces at work in the communities where they sit" deserves deference. Edgerson on Behalf of Edgerson v. Clinton, 86 F.3d 833, 838 (8th Cir. 1996); Maj. Op. 11. But this does no work because the district court did not make any factual findings, let alone findings that "segregative interdistrict transfers had already negatively affected the Districts." Maj. Op. 11. Assumptions, especially those contradicted by the record, deserve no deference.

II.

The district court granted unwarranted equitable relief by prohibiting "segregative" interdistrict transfers "unless such a transfer is requested for education or compassionate purposes and is approved by [the Districts'] school board on a case-by-case basis." Add. 18. The district court exempted the Districts from Arkansas's school choice law because it creates a "genuine conflict under active desegregation orders . . . that explicitly limits the transfers between school districts." Ark. Code Ann. § 6-18-1906(a)(2). Notably, this remedy does not relieve the Districts from performing a stale or unworkable condition in the decrees; it creates an express conflict (and the only conflict) with Arkansas law. In other words, it does the same thing as declaring that the Arkansas law is unconstitutional as to these Districts *without deciding whether the law has a current segregative effect or violates equal protection*. By granting this relief, the district court transgressed a "bedrock principle that federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." Missouri v. Jenkins, 515 U.S. 70, 97–98 (1995).

The district court's remedy violates the limits of a federal court's remedial authority in two ways. Without identifying a constitutional violation, a district court cannot impose a new remedy that supersedes state law. Jenkins, 807 F.2d at 666

-22-

("Federal courts may not invoke their equitable power to fashion a remedy to correct a condition unless it currently offends the Constitution."); Liddell v. Missouri, 731 F.2d 1294, 1305 (8th Cir. 1984) ("The remedy must therefore be related to 'the *condition* alleged to offend the Constitution.'" (citing Milliken v. Bradley, 433 U.S. 267, 280–281 (1977) (Milliken II)) (emphasis in original)); Edgerson, 86 F.3d at 837 (same). Although the Districts requested that the court declare that the Act was unconstitutional, the district court expressly declined to do so. Because the court made no finding that the Constitution was violated, it erred by modifying the decrees. That is why in Liddell, we reversed the district court's order requiring Missouri to pay for interdistrict transfers between the suburban counties. That relief was "not geared to remedy the violation found within the city." 731 F.2d at 1309.

The second error is that the district court's remedy "must not create or perpetuate a constitutional violation." *Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist., No. 1*, 56 F.3d 904, 914 (8th Cir. 1995). The Supreme Court has explained that a desegregation decree "contemplating the substantive constitutional right to a particular degree of racial balance or mixing is [] infirm as a matter of law." Milliken II, 433 U.S. at 281 n.14 (1977). The remedy does just that—sorting students solely on whether the Districts' racial balance would change. The Department of Education fairly objects that "blanket race-based student assignments in public schools are not 'narrowly tailored to the goal of achieving the educational and social benefits asserted to flow from racial diversity' and violate Equal Protection." Dept. Br. 35.

"It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007) (citation omitted). Because racial classifications are simply too pernicious, "the school districts must demonstrate that the use of individual racial classifications in the [school choice transfers] here under review is 'narrowly tailored' to achieve a 'compelling' government interest." Id. Remedying the effects of past intentional discrimination is a compelling interest, but once a school "achieve[s]

-23-

unitary status, it ha[s] remedied the constitutional wrong that allowed race-based assignments." Id. at 721. The Court emphasized that "[t]he harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation, and that the Constitution is not violated by racial imbalance in the schools, without more." Id. (citation omitted).

The district court's remedy is a "categorical race-based limitation" on interdistrict transfers. Teague v. Cooper, 720 F.3d 973, 975 (8th Cir. 2013). The prohibition on interdistrict transfers is based solely on the student's race, and it seeks to preserve racial balance within a school district. It does not matter that a federal court, rather than Arkansas, ordered the remedy. See Milliken II, 433 U.S. at 281 n.14. To satisfy the Constitution, the Districts must provide a compelling interest.

The Districts advance two compelling interests. They claim that the "continuing legacy of *de jure* segregation" justifies the use of race. Dist. Br. 38. The majority acknowledges that Camden-Fairview, like the Jefferson County schools in Parents Involved, has achieved unitary status. Maj. Op. 12. Because Camden-Fairview has remedied that wrong, this is not a compelling interest. Hope, Lafayette, and Junction City have not achieved unitary status, but there is no evidence the modification is tailored to "the harm that is traceable to segregation." Parents Involved, 551 U.S. at 721. The district court's remedy reinstates the 1989 Act's prohibition on "segregative" interdistrict transfers that was repealed and replaced in 2013. The Arkansas General Assembly acted because a federal district court declared that the provision "violates the Equal Protection Clause . . . and [] permanently enjoin[ed] the State of Arkansas from applying" it. Teague ex rel. T.T. v. Arkansas Bd. of Educ., 873 F. Supp. 2d 1055, 1068 (W.D. Ark. 2012). Any harm here is only traceable to Arkansas's attempt to comply with federal law, so the district court's modification does not remedy the effects of past segregation.

The Districts also argue that the "potential for white flight" that impedes their ability to comply with the decrees is a compelling interest. Dist. Br. 38. If the school choice transfers caused re-segregation, that may be a compelling interest. See United

-24-

States v. Lowndes County Bd. of Ed., 878 F.2d 1301 (11th Cir. 1989) (interdistrict transfers causing 9.3% cumulative difference in white enrollment violated desegregation order). But that is not this case. Transfers of students that attend private schools have no impact on the Districts' racial demographics. And other evidence showed that school choice transfers would have little impact on any district's racial balance. The Districts failed to show that school choice transfers are "a substantial cause of interdistrict segregation." Edgerson, 86 F.3d at 837.

By modifying the consent decrees, the district court exceeded its equitable powers by failing to identify a constitutional violation related to the remedy and creating an unconstitutional remedy that denies interdistrict transfers based solely on the student's race.

III.

Unfortunately, the majority fails to heed the Supreme Court's warning that "the dynamics of institutional reform litigation differ from those of other cases." Horne v. Flores, 557 U.S. 433, 448 (2009). Sometimes defendants are "happy to be sued and happier still to lose," because they can agree to injunctions that "bind state and local officials to the[ir] policy preferences" and "improperly deprive future officials of their designated legislative and executive powers." Id.

The Districts are happy to lose: Junction City, for example, is an adjudged constitutional violator and may now grant or deny transfers based on race. The Districts may grant a transfer "requested for educational or compassionate purposes," and the Districts acknowledge that of the granted transfers, most have been segregative. Add. 18; Oral Arg. 20:35. And according to the Districts, "[s]chool boards have arrived at the correct conclusions perhaps faster than some of the parents," so they are better positioned to make these decisions, even race-based decisions. Oral Arg. 21:37. With such fuzzy parameters, I take no comfort that the Districts, who initially violated the Constitution and necessitated the original decrees, now have the unfettered discretion to grant or deny transfers based on race.

-25-

The Districts' "friendly adversary relationship with the plaintiffs" has paid off. Jenkins, 515 U.S. at 79 (reversing district court orders that increased school district's reliance on continued federal court supervision). These decrees sat dormant for decades until the Districts joined with nominal plaintiffs to seek an exemption to generally applicable Arkansas law. With a new federal court decree, they upset Arkansas's policy choice to allow parents to choose what school their children will attend.

The district court's remedy is antithetical to the goals of desegregation cases: achieving integrated schools and ending federal court supervision. This is a step back that unnecessarily restricts the legitimate policy choices of the people of Arkansas, expressed through the legislature. I respectfully dissent.

_____